COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH


NO. 2-09-023-CV

JOE KAUFMAN                                                    APPELLANT

V.

ISLAMIC SOCIETY OF ARLINGTON,                                 APPELLEES
TEXAS, ISLAMIC CENTER OF IRVING,
DFW ISLAMIC EDUCATIONAL
CENTER, INC., DAR ELSALAM
ISLAMIC CENTER, AL HEDAYAH
ISLAMIC CENTER, ISLAMIC
ASSOCIATION OF TARRANT COUNTY,
AND MUSLIM AMERICAN SOCIETY
OF DALLAS

------------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### Introduction

Appellant Joe Kaufman appeals the trial court's denial of his traditional

motion for summary judgment against appellees Islamic Society of Arlington,

Texas; Islamic Center of Irving; DFW Islamic Educational Center, Inc.; Dar Elsalam Islamic Center; Al Hedayah Islamic Center; Islamic Association of Tarrant County; and Muslim American Society of Dallas.[1]  Appellees move to dismiss the appeal.  We deny appellees' motion to dismiss, we reverse the trial court's denial of Kaufman's summary judgment motion, and we render judgment for Kaufman.

### Background Facts

In 2007, the Islamic Circle of North America [ICNA] Dallas, along with "all DFW Masajid[2] and Islamic Centers," (as stated in a promotional flyer) sponsored Muslim Family Day at Six Flags Over Texas in Arlington.  Six Flags scheduled the event for October 14, 2007.  The flyer for the event stated that tickets could be purchased from appellees Islamic Society of Arlington, Texas and Islamic Center of Irving, among other groups.

---

[1] The introductory portion of Kaufman's brief signals that he is raising eleven issues; however, the listed issues do not directly correspond to portions of Kaufman's brief, and the issues all relate to various aspects of the propriety of the trial court's summary judgment decision.

[2] A Masajid is a mosque.

On September 28, 2007, the Front Page Magazine website[3] published an article by Joe Kaufman titled, "Fanatic Muslim Family Day." That article related:

> On Sunday, October 14, 2007, Six Flags Over Texas, a Dallas-area amusement park, will be invaded by a radical Muslim organization that has physical ties with the Muslim Brotherhood and financial ties to Hamas. While most patrons of the park come for the games and rides, those involved with this group's event, Muslim Family Day, may very well have found an original and appealing way to spread anti-Western hatred.
>
> The Islamic Circle of North America (ICNA), an umbrella organization for South Asian-oriented mosques and Islamic centers throughout the United States and Canada, has been in existence for over three decades. Those that founded it had done so in order to create an American arm for the Muslim Brotherhood of Pakistan, Jamaat-e-Islami (JI), and never has ICNA relinquished that connection. Indeed, just one year ago, ICNA was the top donor of a JI charity, the Al-Khidmat Foundation (AKF), that provided tens of thousands of dollars to the head of Hamas, Khaled Mashaal.
>
> Apart from its working relationship with terrorists abroad, ICNA does an exceptional job of portraying itself as "mainstream." The group runs annual functions, in a number of cities, that are presented as family entertainment. The same will be the case, next month, when members of ICNA embark on Arlington, Texas, at Six Flags Over Dallas, for their Muslim Family Day.
>
> Co-sponsoring the day is the Islamic Association of North Texas (IANT) a.k.a. the Dallas Central Mosque.[4] IANT has helped

---

[3] The website can be accessed at http://www.frontpagemagazine.com.

[4] Neither ICNA nor IANT were plaintiffs in this suit. Jamal Qaddura, president of appellee DFW Islamic Educational Center, Inc., testified during his deposition that this lawsuit was the first time he had heard of ICNA. Nothing in

to raise hundreds of thousands of dollars for the legal defense of Hamas operative Ghassan Elashi and his four brothers, one of which was on the mosque's board. The Elashis have been tied to a Hamas financing ring, which included an internet company . . . and an Islamic charity, Holy Land Foundation for Relief and Development (HLF). A Dallas trial regarding the Elashis and HLF, which began in July, is currently in its closing stages.

The upcoming event will feature prayer sessions at the Music Mill Theatre, halal[5] food vendors, and Islamic organization tables offering the latest in extremist propaganda. As well, drawing parallels to Hamas TV's late Mickey Mouse look-alike, Farfur, Muslim Family Day will offer a Bugs Bunny and Friends parade.

This is not the first time ICNA has used Six Flags to spread its message. The group holds yearly events at Six Flags' Great Adventure in New Jersey, the most recent of which took place in September of 2006. While many would consider it a harmless gesture for an organization to rent out an amusement park, with regard to ICNA, nothing is harmless.

As stated previously, ICNA was found to have been a recent donor to Hamas. However, ICNA has also been involved in the financing of Al-Qaeda. Shortly before (and after) the attacks on 9/11, ICNA's Southeast division called on its website viewers to give "material support" to their brethren in Chechnya. Attached to this call was a link to one of the main websites raising funds and recruiting fighters for Al-Qaeda and the Taliban. The site, Jihad in Chechnya, was produced by Azzam Publications, named for the mentor of Osama bin Laden, Abdullah Azzam. Additionally, one of the individuals involved in the creation of the website, Mazen Mokhtar, who has since been indicted on charges of tax fraud, was a featured speaker at different ICNA and ICNA-affiliate events.

---

the record indicates that any of appellees' organizations have any formal connection with either ICNA or IANT.

[5] Halal food is prepared in conformity with Islamic religious guidelines.

4

Over time, ICNA has worked to create various radical projects. Among them are its youth wing, Young Muslims (YM), and a web information center called Why Islam? [The logos of YM and Why Islam? are found on the homepage of the Muslim Family Day website.][6] Both of these institutions provide forums on the Internet for members and organization leaders to converse with one another. Found on the forums have been support for overseas terrorist organizations and calls for violence against Americans and Jews.

. . . .[7]

While using images of cartoon characters and sponsoring events at amusement parks may seem innocuous, the danger that the [ICNA] poses to the United States, Canada[,] and others is clear. As a faction of the Muslim Brotherhood, the organization looks to impose Islam on Western society, and as a donor to a terrorist organization, the group is a willing participant in the act of violence.

ICNA's Muslim Family Day that will occur on October 14, 2007 is nothing but a charade, created to spread hatred, but veiled in a way to make the sponsoring organization look harmless. Six Flags will play host to this dangerous farce. If events, such as these, are allowed to continue, more and more Americans could become desensitized to those groups—fifth columns[8] within our borders that wish to do us harm. It is up to those concerned to speak out against these travesties that threaten our way of life.

---

[6] This bracketed sentence appears as part of Kaufman's original article.

[7] This omitted portion of Kaufman's article contained two paragraphs related to the content of the forums on the YM and Why Islam? websites.

[8] Appellees have asserted that a "fifth column" is a "group of secret sympathizers or supporters of an enemy that engage in espionage or sabotage within defense lines or national borders."

5

> Americans Against Hate will be leading a protest outside Six Flags Over Texas, on Sunday, October 14th to call attention to ICNA's ties to terrorist financing. Those that wish to get involved are asked to e-mail . . . .

The Front Page Magazine website included a graphic that contained the Six Flags logo and incorporated the word "JIHAD" written in what appeared to be dripping red letters over an outline of the state of Texas. About nine thousand people attended Muslim Family Day. Kaufman appeared at the event; he picketed with other protestors along a roadway outside of Six Flags' property while carrying a sign that stated, "Six Flags Over Terrorists."

Appellees filed this lawsuit against Kaufman in October 2007. That month, the trial court denied Kaufman's special appearance and also granted appellees' application for a temporary injunction against Kaufman, prohibiting him from threatening to take unlawful action against any of appellees or their members or causing or threatening to cause bodily injury to any of appellees or their members. In November 2007, Kaufman filed his original answer.

On April 4, 2008, Kaufman filed a no-evidence motion for summary judgment on appellees' defamation and intentional infliction of emotional distress claims and on their request for exemplary damages. On April 18,

6

2008, appellees filed their fourth amended petition,[9] which alleged that Kaufman generally used his website to incite hate against Islamic organizations and citizens and that he specifically used the website to attack appellees' association with Muslim Family Day by giving the impression that "the supporters and sponsors of the [event] are terrorists or supporters of terrorism." The petition requested injunctive relief related to Kaufman's existing and future internet publications and nominal damages.[10]

On October 21, 2008, appellees filed a motion for partial summary judgment, attaching affidavits[11] and other documents that they asserted

---

[9] The fourth amended petition is appellees' most recent pleading. The record indicates that Appellees filed their first and second amended petitions in October 2007 and that they filed their third amended petition on April 4, 2008. However, none of these petitions are included in our record on appeal.

[10] The fourth amended petition did not include any claim for intentional infliction of emotional distress; it contained only defamation claims. Qaddura, submitted an affidavit regarding Kaufman's articles that appellees attached to the petition. In part, the affidavit asserted that Kaufman has "delusional rantings," that he is a "radical on the Israeli side of the international debate over Palestine," and that he "wishes to stir up anger, resentment, bias, and hatred of peaceful, law abiding citizens, solely because of their religion." Qaddura attached to his affidavit, among other exhibits, Kaufman's article on Muslim Family Day, a press release regarding Kaufman's protest, and a Fort Worth Star-Telegram article about the protest.

[11] Specifically, Jehad Alasad, president of appellee Islamic Society of Arlington, Inc., stated that his organization, a "private corporation which generally seeks to avoid media attention," had spiritual and community purposes unrelated to terrorism. He explained his group's association with Muslim Family Day as follows:

7

established their defamation claims beyond any genuine issue of material fact and as a matter of law. In the motion, appellees conceded that much of Kaufman's article was "devoted to discussions of [ICNA]" and its financial links to Islamic groups unconnected to appellees.[12] However, they contended that the article "makes no distinction among the event's sponsors" by referencing "'these groups' as sympathizers or supporters of an enemy."[13]

---

> Essentially, if a group guaranteed that its members would purchase a minimum number of tickets, the group could promote its event at Six Flags . . . . In the summer of 2007, a number of groups . . . entered into an agreement with Six Flags to promote [Muslim Family Day]. These groups included [appellees]. . . . Six Flags agreed to set aside the Music Mill Theater for participants of Muslim Family Day to gather, to participate in the daily Islamic prayers if they wished, and to permit vendors to make Halal food . . . .

Alasad also recited that he viewed Kaufman's article and graphic about Muslim Family Day, and he contended that the article signaled to him that Kaufman alleged that the organizations sponsoring Muslim Family Day promoted terrorism. Other representatives from the other appellees submitted similar affidavits.

[12] In their appellate brief, appellees have again admitted that much of Kaufman's article was "devoted to discussions of the [ICNA] and the [IANT], neither of whom are parties to this case."

[13] Appellees' motion further contended,

> by juxtaposing statements in the article relating to . . . the terrorist sponsorship of ICNA and IANT with statements regarding the Six Flags event and its sponsors and participants, the article conveys the false and defamatory message that the sponsors and participants are engaged in an event that promotes anti-Western

8

Six days after filing their motion for partial summary judgment, appellees filed their response to Kaufman's no-evidence summary judgment motion. The same day that appellees filed their response, Kaufman filed a traditional motion for summary judgment. Kaufman attached an affidavit to that motion, which included statements that

- he learned of Muslim Family Day while researching issues related to terrorism, he discovered ICNA's relationship to Hamas through Muslim websites, and he "wrote the at-issue article [and created the graphic and the 'Six Flags Over Terrorists' sign] . . . in order to expose [his] research regarding ICNA and its ties to Hamas";

- he has never doubted the truth of the statements in his article, because he conducted "hours of extensive research" before publishing them; and

- he never specifically identified any group or individual other than ICNA and IANT, and he had "no intention whatsoever to implicate any of the [appellees] with terrorism or nefarious activity," because he had "no knowledge that the majority of the [appellees'] entities even existed."

Kaufman also attached to his motion (1) appellees' written discovery responses, (2) Google search result pages, (3) a deposition transcript,[14] and (4) evidence

_____

hatred, terrorism, espionage, and sabotage.

[14] The transcript came from the deposition of Qaddura, who testified in part that Kaufman's article terrified him of being harmed when he attended Muslim Family Day and that Kaufman branded "any Muslim that attended the event as a terrorist."

9

that he claimed substantiated the facts in his article about ICNA and IANT's ties to terrorism.

On November 6, 2008, appellees filed a response to Kaufman's traditional summary judgment motion. They objected to portions of Kaufman's summary judgment evidence, asserted that he is not a media defendant for the purposes of First Amendment protection because he only communicates his articles through the internet (rather than in print or through radio or television), and reiterated their belief that Kaufman's statements were defamatory as a matter of law.

After Kaufman filed a response to appellees' partial summary judgment motion and he filed proposed findings of fact and conclusions of law, in January 2009, the trial court sent all counsel a letter informing them that it was denying all parties' motions for summary judgment and that it was sustaining some of appellees' objections to Kaufman's summary judgment evidence.[15] The trial

---

[15] Specifically, the trial court sustained objections to (1) two lists of "Unindicted Co-conspirators and/or Joint Venturers" filed in a federal criminal case; (2) an attachment allegedly related to terrorism donations; (3) printouts of web pages related to appellees' addresses; and (4) the Google search result printouts. The court denied the remainder of appellees' objections. Kaufman has not raised any issue on appeal related to the trial court's decision to sustain appellees' objections; therefore, we will not consider any of the documents that the trial court excluded. *See* Tex. R. App. P. 38.1(i); *Inglish v. Prudential Ins. Co. of Am.*, 928 S.W.2d 702, 706 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (op. on reh'g).

10

court then formally entered an order reflecting the decisions it had communicated through its letter.[16] Kaufman filed his notice of this interlocutory appeal.

## Our Jurisdiction Over This Appeal

Appellees have filed a motion to dismiss Kaufman's appeal, contending that we lack jurisdiction to consider it. Kaufman has responded by arguing that section 51.014(a)(6) of the civil practice and remedies code authorizes his interlocutory appeal.[17] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6) (Vernon 2008).

An order denying a motion for summary judgment is interlocutory and generally not appealable. *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 623 (Tex. App.—Fort Worth 2007, pet. denied) (op. on reh'g). However, section 51.014(a)(6) provides that a party may appeal an interlocutory order that

> denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print

---

[16] The order stated that the court denied Kaufman's summary judgment motion that he filed on October 27, 2009—this was Kaufman's traditional motion.

[17] Kaufman also relied on section 51.014(a)(6) in his notice of appeal that he filed with the trial court.

media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73.[18]

Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(6); *see Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 842–43 (Tex. 2007); *SNF, Inc.*, 223 S.W.3d at 623; *Fort Worth Star-Telegram v. Street*, 61 S.W.3d 704, 708 (Tex. App.—Fort Worth 2001, pet. denied). We strictly construe statutes giving us jurisdiction over interlocutory appeals. *See Tex. S. Univ. v. Gilford*, 277 S.W.3d 65, 71 (Tex. App.—Houston [1st Dist.] 2009, pet. filed); *Am. Online, Inc. v. Williams*, 958 S.W.2d 268, 271 (Tex. App.—Houston [14th Dist.] 1997, no pet.).

In their dismissal motion and in their brief, appellees contend that Kaufman's interlocutory appeal under section 51.014(a)(6) is improper because he has failed to establish that he is a "member of the electronic or print media," as the section requires. Specifically, they assert that Kaufman cannot be a media defendant under section 51.014(a)(6) because he "merely posts to the

---

[18] Chapter 73 of the civil practice and remedies code establishes some statutory elements and defenses of libel claims. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 73.001–.006 (Vernon 2005). Kaufman's traditional summary judgment motion contained contentions regarding chapter 73 and the First Amendment, and appellees' summary judgment motion sought relief under chapter 73 (although their petition had not cited to that chapter), along with common law defamation.

internet," because Front Page Magazine is simply Kaufman's own internet blog (an assertion that is belied by the affidavits discussed below), and because Kaufman has not demonstrated that he has the training associated with traditional journalism. Kaufman asserts that he is a media defendant under that section 51.014(a)(6) because, among other reasons, he published his article on Muslim Family Day "in his role as a journalist . . . regarding a national issue of public concern—terrorism." The parties have asserted that Kaufman's status as a media defendant under section 51.014(a)(6), considering the online nature of his article and graphic that are the subject of appellees' defamation claims, is an issue of first impression.[19]

> In *SNF, Inc.*, we explained that to
>
> determine the scope of our jurisdiction, we look to the legislature's intent in enacting section 51.014(a)(6). Unless a statute is ambiguous, we discern that intent from the language of the statute itself. We cannot construe a statutory provision to lead to an absurd result if the provision is subject to another more reasonable interpretation. Further, we consider the provisions of a statute as a whole and not in isolation.

*SNF, Inc.*, 223 S.W.3d at 626 (footnotes and citations omitted). We then opined that a "plain reading of this language evidences clear legislative intent

---

[19] Like the parties, we have not found any Texas cases that squarely address the issue of an internet author's status as a member of the print or electronic media under section 51.014(a)(6).

13

that a party seeking summary judgment on claims or defenses that implicate free speech be entitled to appeal a trial court's denial of this relief." *Id.*; *see Koseoglu*, 233 S.W.3d at 842–43; *TSM AM-FM TV v. Meca Homes, Inc.*, 969 S.W.2d 448, 451 (Tex. App.—El Paso 1998, pet. denied) (stating that by providing for an interlocutory appeal, Section 51.014(a)(6) permits "courts to sort out unmeritorious libel cases before the cases enter[] the time-consuming and expensive trial phase").

The evidence contained in the appellate record and submitted through additional affidavits filed in this court[20] establishes the following:

---

[20] We may consider documents submitted by the parties that are outside of the trial court's record for the purpose of determining our own civil jurisdiction. *See* Tex. Gov't Code Ann. § 22.220(c) (Vernon 2004); *Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595 S.W.2d 840, 841 (Tex. 1979); *Kenseth v. Dallas County*, 126 S.W.3d 584, 593 (Tex. App.—Dallas 2004, pet. denied); *see also Lindsey v. Kline*, No. 02-03-00239-CV, 2004 WL 1699909, at *2 (Tex. App.—Fort Worth July 29, 2004, no pet.) (mem. op.) (stating that we may "consider affidavits or other evidence not included in the appellate record to determine our own jurisdiction").

In response to appellees' motion to dismiss this appeal, Kaufman filed a declaration from David Horowitz and an additional affidavit from himself, documents that are not in our appellate record, in an attempt to strengthen his claim that he satisfies the criteria of section 51.014(a)(6). Appellees filed objections and a motion to strike these additional documents, contending that there is no authority for adding new evidence to the appellate record and that Horowitz's declaration did not satisfy the requirements of an affidavit under Texas law. Kaufman filed a response to appellees' objections and motion to strike, and he also filed an affidavit from Horowitz as a substitute for Horowitz's declaration. In his response, Kaufman stated that he submitted

14

- Kaufman is a full time investigative journalist who has been writing for national publications since 1995 and who focuses primarily on terrorism issues by gathering information from "government publications, public government documents, and Muslim websites";

- Kaufman writes regularly for Front Page Magazine, which is a "national publication which focuses mainly on the issues of politics and terrorism and has a monthly readership of approximately 500,000." Kaufman has published more than one hundred articles on Front Page Magazine;

- Kaufman does not control whether Front Page Magazine publishes news stories that he submits to it, and he does not control whether Front Page Magazine edits such pieces if selected for publication. Front Page Magazine is published by the David Horowitz Freedom Center;

- Horowitz is the editor-in-chief of Front Page Magazine. Horowitz is a nationally recognized author and political commentator who has written several books, has spoken to over three hundred colleges, and has appeared on several television programs. Horowitz publishes Kaufman's news and commentary because, according to Horowitz, Kaufman is "among the few journalists investigating ties between domestic individuals . . . and [terrorist] organizations";

Horowitz's declaration as "proof responsive to a motion to dismiss an appeal."

Based on the authority cited above, we will consider Horowitz's affidavit and Kaufman's additional affidavit for the limited purpose of determining our jurisdiction over this interlocutory appeal under section 51.104(a)(6), which is an issue that, of course, could not have been litigated in the trial court. We will not consider the additional affidavits for any other purpose, including the propriety of the trial court's summary judgment decision. We therefore overrule appellees' objections and their motion to strike Kaufman's additional affidavits.

15

- Kaufman is the co-founder and chairman of the board of directors for Americans Against Hate, which is a Florida nonprofit organization that has other executive officers; and

- Kaufman has given "numerous speeches at various conferences and educational institutions," and he has "appeared on most of the major television networks, including Fox News, CNN, MSNBC, and CNBC."

We believe that these facts and circumstances, establishing (1) Kaufman's journalistic background and his notoriety outside of the parameters of the article and graphic at issue and (2) Front Page Magazine's broad readership and its existence as a news/commentary medium that is independent from Kaufman's articles, are sufficient to qualify Kaufman as a "member of the electronic or print media" and to qualify Front Page Magazine as an electronic or print medium in which Kaufman's article and graphic appeared. We cannot agree with appellees that Front Page Magazine's internet status alone[21] costs Kaufman his benefit to file an interlocutory appeal as a member of the electronic media[22] for several reasons.

---

[21] Appellees assert that Kaufman is not a media defendant under section 51.014(a)(6) because Front Page Magazine is not a "printed newspaper or magazine, or part of a radio or television broadcast." They further contend that Kaufman "is asking this Court to make the unprecedented ruling that postings made solely to the internet by an individual should be accorded the same 'media defendant' protections as newspapers, magazines, and radio and television stations."

[22] Appellees do not contest the fact that Front Page Magazine, through its internet existence, is "electronic" in nature.

16

First, authority that we consider instructive on this issue indicates that articles communicated through the internet equate in legal effect in some circumstances to words published by more traditional electronic or print media. For instance, in *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, the federal Fifth Circuit Court of Appeals considered how the Texas Supreme Court would resolve a statute of limitations issue regarding libel in an internet publication. 512 F.3d 137, 143 (5th Cir. 2007). In applying the same statute of limitations rule to internet publications that Texas applies to traditional publications, the Fifth Circuit noted that

> some courts have reasoned that the "functional similarities between print and Internet publication" support application of the single publication rule to both types of media. As one court noted, "A statement electronically located on a server which is called up when a web page is accessed, is no different from a statement on a paper page in a book lying on a shelf which is accessed by the reader when the book is opened."

*Id.* at 144 (citations omitted).

Second, although appellees negatively characterize the internet's use as an avenue of communication in their attempt to distinguish it from more traditional media,[23] the United States Supreme Court has extended First

---

[23] Appellees assert in their brief that the internet "has become a combination of gossip fence, coffee house, back alley, and bathroom stall for the dissemination of gossip, rumor, innuendo, and outright falsehood."

17

Amendment protections to information published through the internet. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874–85, 117 S. Ct. 2329, 2345–51 (1997). In *Reno*, after examining the background, growth, and characteristics of the internet,[24] the Court held that there is no basis for "qualifying the level of First Amendment scrutiny that should be applied to [the internet] medium." *Id.* at 870, 117 S. Ct. at 2344; *see also In re Does 1–10*, 242 S.W.3d 805, 820 (Tex. App.— Texarkana 2007, orig. proceeding) (stating

---

[24] Specifically, the Court stated that the internet is comparable to

a vast library including millions of readily available and indexed publications . . . .

From the publishers' point of view, it constitutes a vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers. Any person or organization with a computer connected to the Internet can "publish" information. Publishers include government agencies, educational institutions, commercial entities, advocacy groups, and individuals. Publishers may either make their material available to the entire pool of Internet users, or confine access to a selected group, such as those willing to pay for the privilege.

. . . .

. . . This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue.

*Reno*, 521 U.S. at 853, 870, 117 S. Ct. at 2335–36, 2344 (citations and footnotes omitted).

that "[s]peech over the Internet is afforded no lower level of First Amendment scrutiny").

Third, as Kaufman has argued, Texas Supreme Court precedent signals that when the text of a statute logically authorizes the application of the statute to a new technology or communication medium, we should apply the statute in that way. In *San Antonio & A.P. Ry. Co. v. Sw. Tel. & Tel. Co.*, the court examined a statute related to condemnation of property for the installation and maintenance of telegraph lines. 93 Tex. 313, 318–19, 55 S.W. 117, 117 (1900). The issue before the court was whether that same statute applied to condemnation for telephone lines, even though the statute did not specifically mention telephone lines because telephones had just recently been invented when the telegraph statute was enacted. *Id.* at 317–19, 55 S.W. at 117. In holding that the telegraph statute did apply to telephone lines, the court reasoned in part that if a statute's "language used is broad enough to embrace a subsequently developed method, the later invention might be controlled by the pre-existing law, as if it had been in existence at the time the law was made." *Id.* at 318, 55 S.W. at 117; *see also Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 705 (Tex. 2002) (explaining that the supreme court's holding in *San Antonio & A.P. Ry. Co.* was based in part on the telephone and telegraph comprising "two different means of accomplishing the same

19

communicative purpose"). Like telegraphs and telephones, traditional media and the internet can exist as two different means of accomplishing the same communicative purpose.

Fourth, various courts outside of our jurisdiction have recognized the internet (either implicitly or explicitly) as a type of nontraditional electronic media. *See Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1261 (10th Cir. 2008) (noting that advertisements occurred in "various print, online, and television media"), *cert. denied*, 129 S. Ct. 1006 (2009); *Belo Corp.*, 512 F.3d at 144 (explaining that while there are differences between print media and the internet, "the similarities between the two media support application of a consistent rule"); *Gaeth v. Deacon*, 964 A.2d 621, 627 (Me. 2009) (stating that "an increasingly greater portion of the population obtains more of its information through television, the Internet, and other electronic media"); *see also Ostergren v. McDonnell*, No. 3:08cv362, 2008 WL 3895593, at *9 n.3 (E.D. Va. Aug. 22, 2008) (opining that "it might be said that the [i]nternet has taken over the role of traditional print media. It can hardly be contested that there is an ongoing shift away from traditional print media toward the internet").

Fifth, appellees have not provided any sufficient reason to distinguish internet communicators from other electronic or print media under section

51.014(a)(6).  Appellees' proposed rule—that an internet author could never qualify as a member of the media under that section—would make as little sense as an inverse rule that a print author (such as someone distributing their own photocopied musings) would always qualify as such.

Sixth, recent legislative action supports Kaufman's status as a member of the media through his internet publications.  In adding provisions related to a testimonial privilege for journalists to the civil practice and remedies code in April 2009, the Texas legislature broadly defined "news medium" as

> a newspaper, magazine or periodical, book publisher, news agency, wire service, radio or television station or network, cable, satellite, or other transmission system or carrier or channel, or a channel or programming service for a station, network, system, or carrier, or an audio or audiovisual production company or Internet company or provider, or the parent, subsidiary, division, or affiliate of that entity, *that disseminates news or information to the public by any means*, including:
>
> (A)  print;
>
> (B)  television;
>
> (C)  radio;
>
> (D)  photographic;
>
> (E)  mechanical;
>
> *(F)  electronic; and*
>
> *(G)  other means, known or unknown, that are accessible to the public.*

21

Act of April 30, 2009, 81st Leg., R.S., H.B. 670, § 1 (to be codified at Tex. Civ. Prac. & Rem. Code Ann. § 22.021(3)) (emphasis added). Front Page Magazine is clearly both electronic and accessible to the public; it would therefore qualify as a "news medium" under the statute, and Kaufman would qualify as a contributor to that medium. *See id.*

Finally, permitting Kaufman to challenge the trial court's denial of his summary judgment motion through this interlocutory appeal promotes one of the objectives of section 51.014(a)(6)—it allows us to consider and sort out appellees' defamation claims before this case enters the time-consuming and expensive trial phase. *See TSM AM-FM TV*, 969 S.W.2d at 451.

Rather than using appellees' exclusive standard, we conclude that an internet author's status as a member of the electronic media should be adjudged by the same principles that courts should use to determine the author's status under more traditional media. In other words, we hold that a person who communicates facts or opinions through the internet is entitled to appeal under section 51.014(a)(6) when that person's communication, under circumstances relating to the character and text of the communication itself, its editorial process, its volume of dissemination, the communicator's extrinsic notoriety unconnected to the communication, the communicator's compensation for or professional relationship to making the communication, and

22

other relevant circumstances as the facts may dictate, would otherwise qualify as a communication covered by that section through more traditional electronic or print media.

We do not hold, therefore, that everyone who communicates on the internet would qualify as a member of the electronic media under section 51.014(a)(6). Our decision that an internet communicator may qualify as a member of the media under certain circumstances is strengthened by recent developments in federal law. Specifically, a federal statute related to the fee charged to media for federal agencies' disclosure of public information indicates that such media includes any

> person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. *Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities*.

5 U.S.C.A. § 552(a)(4)(A)(ii) (West Supp. 2009) (emphasis added); *see also Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F.Supp.2d 5, 15 (D.D.C. 2003)

23

(finding that a publisher of a biweekly electronic newsletter qualified as a media entity).

Because we conclude that Kaufman's extrinsic notoriety (through his appearances on television),[25] his substantial readership, the inherent public concern in the terrorism issues he reports and opines on, and his journalistic experience would all favor his qualification as a media defendant under section 51.014(a)(6) if he had reported his article on Muslim Family Day through traditional media, we hold that he likewise qualifies as a media defendant although the article was published on the internet. Thus, we hold that under section 51.014(a)(6), we have jurisdiction over his interlocutory appeal, and we deny appellees' motion to dismiss the appeal.

---

[25] The Houston (Fourteenth) Court of Appeals has noted that the legislative history of section 51.014(a)(6) indicates that the section should cover individuals who "express their opinions on radio or television programs." *Quebe v. Pope*, 201 S.W.3d 166, 170 n.5 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

**The Propriety of the Trial Court's Summary Judgment Decision**

As noted above, Kaufman challenges various aspects of the trial court's order denying his traditional summary judgment motion. Among his arguments, Kaufman contends that appellees' defamation claims are barred as a matter of law because his article and his graphic did not "concern" them.[26]

**Standards of review**

The standard of review for denial of a summary judgment is the same as for the granting of a summary judgment. *Wethington v. Mann*, 172 S.W.3d 146, 148 (Tex. App.—Beaumont 2005, no pet.); *Associated Press v. Cook*, 17 S.W.3d 447, 451 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (deciding an interlocutory appeal filed under section 51.014(a)(6)). In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *City of*

---

[26] Kaufman therefore urges through a title in his brief that appellees lack standing, but in the body of his brief and in his reply brief, he also specifically contends that because his article and graphic did not concern appellees, they cannot satisfy the elements of their defamation claims as a matter of law, and his motion for summary judgment should therefore have been granted. Kaufman likewise asserted in the trial court that appellees' failure to sufficiently connect any of his statements to them resulted in both their lack of standing and in their inability to establish the elements of their defamation claims.

*Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Sw. Elec. Power Co.*, 73 S.W.3d at 215.

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Evidence that favors the movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965).

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

**The requirement of appellees' defamation claims that Kaufman's statements "concerned" them**

26

Whether statements are defamatory is initially a question for a court to decide. *See New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 155 (Tex. 2004), *cert. denied*, 545 U.S. 1105 (2005). Questions regarding defamation liability should be submitted to a jury only where a publication is of ambiguous or doubtful import. *See id.*

To maintain their defamation claims, appellees are required to show that Kaufman published a defamatory statement that "concerned" them.[27] *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 429 (Tex. 2000); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 526 U.S. 1051 (1999); *Fox Entm't Group, Inc. v. Abdel-Hafiz*, 240 S.W.3d 524, 531 (Tex. App.—Fort Worth 2007, pet. denied) (op. on reh'g). To do so, they must demonstrate that Kaufman's article was specifically directed towards them. *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 433 (Tex. App.—Austin 2007, pet. denied) (citing *Rosenblatt v. Baer*, 383 U.S. 75, 81, 86 S. Ct. 669, 673 (1966)).

---

[27] This requirement applies to common law defamation claims and also to libel claims brought under chapter 73 of the civil practice and remedies code; chapter 73 incorporates "a defamation" into its definition of libel. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001; *Pisharodi v. Barrash*, 116 S.W.3d 858, 861 (Tex. App.—Corpus Christi 2003, pet. denied) (listing the "concerning" requirement among the elements of a libel claim).

In other words, "[i]n order to entitle one to maintain an action for an alleged defamatory statement, it must appear that he is the person with reference to whom the statement was made." *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 289, 339 S.W.2d 890, 893 (1960) (holding "as a matter of law that [the plaintiff could not] recover for libel to his person . . . for the reason that the articles refer[red] to no person who could possibly be identified as [him]"). It is "not necessary that the individual referred to be named if those who knew and were acquainted with the plaintiff understand from reading the publication that it referred to [the] plaintiff"; however, the "settled law requires that the false statement point to the plaintiff and to no one else." *Id.* at 289–90, 339 S.W.2d at 894; *see Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.*, 242 S.W.3d 518, 525 (Tex. App.—El Paso 2007, no pet.); *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 180 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (adding that whether a plaintiff is referred to in a statement is "a question of law for the court"). A "claimed implication" is insufficient to "concern" a defamation plaintiff when it is not consistent with the "plain language" and the "full import" of a defendant's statement. *Matthews*, 161 Tex. at 290, 339 S.W.2d at 894.

Appellees are not required to prove that Kaufman intended to refer to them for his statements to have "concerned" them. *Houseman*, 242 S.W.3d

28

at 525. Instead, a "defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." *Id.* at 525–26 (affirming a trial court's decision to grant summary judgment for the defendant in a defamation case by concluding that although "some actual readers [may have been] mislead[,] . . . a hypothetical reasonable reader would not be"). In other words, as the Texas Supreme Court explained in *Isaacks*, the elements of a defamation claim are analyzed through objective standards:

> the hypothetical reasonable person—the mythic Cheshire cat who darts about the pages of the tort law—is no dullard. He or she does not represent the lowest common denominator, but reasonable intelligence and learning. . . . The person of "ordinary intelligence" . . . is a prototype of a person who exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications.
>
> The appropriate inquiry is objective, not subjective. . . .
>
> . . . Intelligent, well-read people act unreasonably from time to time, whereas the hypothetical reasonable reader, for purposes of defamation law, does not. . . . [C]ourts must analyze the words at issue with detachment and dispassion, *considering them in context and as a whole*, as the reasonable reader would consider them.

*Isaaks*, 146 S.W.3d at 157–58 (citations omitted) (emphasis added); *see also*

*Provencio v. Paradigm Media, Inc.*, 44 S.W.3d 677, 681 (Tex. App.—El Paso

29

2001, no pet.) (explaining that "[a]llegedly defamatory statements must be construed as a whole, in light of surrounding circumstances").

**Analysis**

Kaufman's article, as quoted above, almost exclusively regarded ICNA (which is not a party to the defamation claims against Kaufman), its activities, its sponsorship of Muslim Family Day, and its alleged connections to terrorist groups and radical projects. To indicate its focus, the article (with emphasis added)

- refers to "*a* radical Muslim Organization" that will "invade" Six Flags;

- regards ICNA alone as the organization that donated to Hamas;

- states that members of ICNA will "embark on Arlington . . . *for their Muslim Family Day*," explains that the "danger that *the Islamic Circle of North America poses . . . is clear*," and contains further identifiers such as "this group," "the group," "its message," "its website," "its youth wing," and "the sponsoring organization," to restrict the article's import to ICNA; and

- contains only one reference to any other sponsor of Muslim Family Day—IANT—which also did not pursue claims against Kaufman.

Likewise, the text accompanying Kaufman's graphic (which linked to his article) stated, "Six Flags Over Texas opens its doors to *a group* with ties to terror."

30

Neither Kaufman's article nor his graphic named any of appellees' organizations. However, appellees contend that Kaufman's article references them in its first paragraph because it states that "those involved with this group's event, Muslim Family Day, may very well have found an original and appealing way to spread anti-Western hatred." The context of the statement clearly indicates that "this group" is ICNA, not any of the appellees, and for the following reasons, we cannot agree with appellees that a reasonable reader would equate "those involved" to their organizations merely because they were tacitly incorporated[28] as sponsors of the event on a promotional flyer.

First, "those involved" is modified by "this group," and the statement is therefore reasonably read to limit its inference to those individuals attending the event under invitation or direction from ICNA. Second, even if a reasonable reader could attribute a more expansive meaning to "those involved," that meaning would be too broad to encompass only appellees' organizations. *See Matthews*, 161 Tex. at 289–90, 339 S.W.2d at 894. For instance, "those involved" with the Muslim Family Day event in general could extend to any of the "halal food vendors" mentioned in the article, the employees performing the Bugs Bunny and Friends parade that the article referenced, Six Flags

---

[28] Again, the flyer globally included all DFW mosques and Islamic centers as the event's sponsors.

management, or any patron who became interested and participated in the event's activities upon arriving at the amusement park that day.[29] There is simply no indication to a reasonable reader of Kaufman's article that "those involved" meant the sponsors of the event other than ICNA or IANT, because the article did not inform the reader that there were any such other sponsors.[30] Finally, reading that phrase as appellees assert it should be read in isolation from the rest of Kaufman's article weighs against our task to read the article as a whole, and within its full context.[31] *See Isaaks*, 146 S.W.3d at 157; *Provencio*, 44 S.W.3d at 681.

Appellees also contend that the term "those groups" in the article's penultimate paragraph "concerns" them. That paragraph stated,

> ICNA's Muslim Family Day that will occur on October 14, 2007 is nothing but a charade, created to spread hatred, but veiled in a way to make *the sponsoring organization* look harmless. Six Flags will play host to this dangerous farce. If events, such as these, are allowed to continue, more and more Americans could become

---

[29] Appellees represent in their brief that most of the visitors to Six Flags on the day of the event were not Muslims.

[30] In fact, portions of the article would signal to a reasonable reader that there were no other sponsors of the event. For instance, the article states that ICNA "runs" its family entertainment events and relates that it "rent[s] out" the amusement parks for such events.

[31] As is indicated above, the majority of Kaufman's article did not concern Muslim Family Day at all; rather, it concerned ICNA's relation to terrorist individuals and groups and ICNA's internet activities.

desensitized to *those groups* — fifth columns within our borders that wish to do us harm. It is up to those concerned to speak out against these travesties that threaten our way of life. [Emphasis added.]

In context, we conclude that a reasonable reader would restrict the meaning of "those groups" to groups who share the same allegedly harmful goals that ICNA maintains, rather than to unnamed co-sponsors of the Six Flags event, especially in light of the reference to the "sponsoring organization."

Finally, appellees rely on authority regarding defamation of a group to contend that Kaufman's statements "concerned" them, analogizing his statements to those described in *Sellards v. Express-News Corp.*, 702 S.W.2d 677 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.). In *Sellards*, the plaintiff was one of four individuals involved in a one-car accident that killed two of the individuals. *Id.* at 678. The first two of three articles in a newspaper about the accident referred to drug use as a possible cause—one such article stated that the accident could have been a "drug-induced suicide." *Id.* The plaintiff sued the newspaper, contending that the "drug-induced suicide" reference could be read to suggest that every occupant in the vehicle was under the influence of drugs and that all the occupants intended to commit suicide. *Id.* at 678–79. In reversing summary judgment granted in favor of the newspaper, the San Antonio Court of Appeals held that although

33

the article did not specifically state [the plaintiff] was involved in drugs or suicide, the statement, as written, could be taken to refer to any or all of the passengers. When a group is named and the plaintiff is a readily identifiable member of the group, a cause of action for defamation exists if those who know and are acquainted with the plaintiff understand the article refers to the plaintiff.

*Id.* at 680.

We do not agree with appellees that the *Sellards'* holding affects our resolution of this case. Unlike the plaintiff in *Sellards*, appellees were never named in any of Kaufman's publications, and neither was any particular individual or "group," such as the group of four individuals involved in the *Sellards* accident. Rather, Kaufman's publications (including his article, his graphic, and his protest sign) only referred to two specific entities (ICNA and IANT); they never referred to any group of sponsoring organizations of which appellees' organizations were identifiable members. Also, appellees have not cited any cases that apply group defamation theories to plaintiffs that are themselves groups, rather than individuals.

For all of these reasons, we hold that, viewing Kaufman's statements in his article and his graphic, as a whole and with their full import, a reasonable reader who was acquainted with appellees would not view Kaufman's

34

statements as "concerning" them.[32] *See Matthews*, 161 Tex. at 289–90, 339 S.W.2d at 893–94 (explaining that it is "not necessary that the individual referred to be named if those who knew and were acquainted with the plaintiff understand from reading the publication that it referred to [the] plaintiff," but the "settled law requires that the false statement point to the plaintiff and to no one else"); *Houseman*, 242 S.W.3d at 525–26 (affirming a summary judgment for the defendant because a hypothetical reasonable reader would not have understood comments as having concerned the plaintiff). Because appellees were required to show that Kaufman's statements "concerned" them to maintain their defamation claims, because Kaufman moved for summary judgment on the ground that the statements did not, because Kaufman has argued on appeal that they did not, and because we conclude that they did not, we hold that the trial court improperly denied Kaufman's traditional summary judgment motion (which specifically challenged

---

[32] Appellees assert in their brief that Kaufman's "Six Flags Over Terrorists" sign also "concerned" them. Neither appellees' pleading nor their summary judgment motion focused on Kaufman's protest sign as a communication from which they based their defamation claims. In the "Summary Judgment Sought" portion of their motion, they limited the issues on which they sought judgment to those related to Kaufman's "September 28, 2007 'article' and 'graphic.'" Also, in the context of Kaufman's article that preceded Kaufman's protest and the display of the sign, we conclude that a reasonable reader of the sign would associate it with Kaufman's criticism of ICNA and IANT, and not with appellees' groups.

the "concerning" element), and we sustain his issue regarding the denial of his motion.[33]

## Conclusion

Having denied appellees' motion to dismiss this appeal and having sustained Kaufman's issue regarding the trial court's denial of his motion for summary judgment, we reverse the trial court's order denying his motion and render judgment in his favor.  *See* Tex. R. App. P. 43.2(c), 43.3; *City of Cresson v. City of Granbury*, 245 S.W.3d 61, 64–65 (Tex. App.—Fort Worth 2008, pet. denied) (op. on reh'g).


TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, WALKER and MEIER, JJ.

DELIVERED:  June 25, 2009

---

[33] Because we have reached this conclusion as a matter of law, we decline to address Kaufman's alternate but related contention that because his statements did not "concern" appellees, they lacked standing to bring their claims.  *See* Tex. R. App. P. 47.4.  Likewise, we need not address the other issues raised by Kaufman relating to the merits of appellees' defamation claims. *See id.*  Finally, by sustaining Kaufman's challenge to the trial court's denial of his summary judgment motion and rendering judgment in his favor, we do not express any opinion as to the merit or truthfulness of his article at issue.