**Opinion issued September 17, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-12-00660-CV

—————————————

**SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 5, DAN SCHLADEMAN, AND SUSAN STRUBBE, Appellants**

**V.**

**PROFESSIONAL JANITORIAL SERVICE OF HOUSTON, INC., Appellee**

———

**On Appeal from the 61st District**
**Harris County, Texas**
**Trial Court Case No. 2007-27181**

———

# O P I N I O N

A labor union, Service Employees International Union Local 5, and two of

its officers, Dan Schlademan and Susan Strubbe, bring this interlocutory appeal

from the trial court's denial of their motion for summary judgment on Professional

Janitorial Service of Houston, Inc.'s defamation, business disparagement, and tortious interference claims. We dismiss the appeal as outside the scope of our interlocutory jurisdiction.

## Background

PJS, a local janitorial services company, brought this defamation case against the union after PJS became the target of the union's "Justice for Janitors" campaign. PJS alleges that, as a result of its refusal to agree for its employees to be represented by the union outside of a secret ballot election sanctioned by the National Labor Relations Board, the union began publishing defamatory statements about PJS to its customers, tenants of buildings cleaned by PJS, and other third parties. The union published its statements about PJS on the union's website and in flyers, handbills, letters, reports, emails, newsletters, and speeches. Most of the union's statements accused PJS of violating wage-and-hour and other labor laws. The union's admitted goal in publishing these accusations to PJS's customers and others was to cause PJS to lose business to union contractors. According to PJS, it lost more than one dozen accounts due to the union's publications.

The union moved for summary judgment on PJS's claims, alleging that it was entitled to judgment as a matter of law because PJS could not show that the union made the statements that are the subject of the lawsuit with "actual malice"

and because many, if not all, of the statements are nonactionable statements of opinion. The trial court denied the motion, and this interlocutory appeal followed.

## Interlocutory Jurisdiction

PJS initially questions whether we have jurisdiction to hear this appeal because the trial court's denial of the union's motion for summary judgment is an interlocutory order, not a final judgment. As a general rule, an appeal may be taken only from a final judgment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.012 (West Supp. 2012); *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). The legislature, however, can create exceptions to the general rule by statutorily authorizing appellate jurisdiction over certain interlocutory orders. *See Ogletree v. Matthews*, 262 S.W.3d 316, 319 n.1 (Tex. 2007) ("Texas appellate courts have jurisdiction only over final orders or judgments unless a statute permits an interlocutory appeal.") (citation omitted). Section 51.014 of the Civil Practices and Remedies Code contains several such specific grants of jurisdiction over appeals from interlocutory orders. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014 (West Supp. 2012); *see also Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012).

The union relies on section 51.014(a)(6) of the CPRC as conferring interlocutory jurisdiction in this case. That section permits an interlocutory appeal from an order that:

> denies a motion for summary judgment that is based in whole or in
> part upon a claim against or defense by a member of the electronic or

3

print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73[.]

TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6). Thus, interlocutory jurisdiction arises under section 51.014(a)(6) when three criteria are met: (1) the order appealed from is a denial of a motion for summary judgment; (2) the motion is based in whole or in part upon a claim against or defense by "a member of the electronic or print media, acting in such capacity," or "a person whose communication appears in or is published by the electronic or print media"; and (3) the claim or defense arises under the free speech or free press provisions of the United States Constitution,[1] the Texas Constitution,[2] or Chapter 73 of the CPRC.[3] *See id.*

PJS challenges the second criterion, asserting that the union is not within the class of persons contemplated by the statute. *Cf. Tex. A & M Univ. Sys. v.*

---

[1] The United States Constitution prohibits Congress from making any law "abridging the freedom of speech, or of the press." U.S. CONST. amend. I.

[2] The Texas Constitution provides that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press." TEX. CONST. art. I, § 8.

[3] Chapter 73 defines the required elements of a libel action as well as certain privileged matters and defenses for members of the media. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 73.001, .002, .004, .006 (West 2011). It additionally provides that truth is a defense in a libel action. *Id.* § 73.005.

4

*Koseoglu*, 233 S.W.3d 835, 842−43 (Tex. 2007) (noting that section 51.014(a)(6) "can only be read as allowing appeals by members of the media 'or a person whose communication appears in or is published by' the media," and that "[n]o other person would typically have standing to appeal the denial of 'a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media or is published by the electronic or print media'") (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6)). The union responds that it is both a member of the media and a person whose communication appeared in or was published by the media.[4] We address each argument in turn.

## A.    Standard of review

We review issues of statutory construction de novo. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010). Our primary objective in construing statutes is to give effect to the legislature's intent. *Id.* (citing *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009)). "We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). Otherwise, we construe the statute's words according to their plain and common meaning unless a contrary intention is

---

[4]    The individual defendants do not assert that they are members of the media.

apparent from the context or such a construction leads to absurd results. *Id.*; *see Tex. Lottery Comm'n*, 325 S.W.3d at 635 ("We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or the plain meaning leads to absurd results."); *Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893, 901 (Tex. 2010) ("Presuming that lawmakers intended what they enacted, we begin with the statute's text, relying whenever possible on the plain meaning of the words chosen.") (citations omitted); *Fitzgerald v. Advanced Spine Fixation Sys.,* 996 S.W.2d 864, 866 (Tex. 1999) (explaining that "it is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent"). We consider the statute in its entirety and presume the legislature intended a just and reasonable result when it enacted the statute. *City of Rockwall*, 246 S.W.3d at 626.

Because section 51.014 is in derogation of the general rule that only final judgments are appealable, we strictly construe it. *See CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011) ("We strictly apply statutes granting interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable."); *Jennings v. WallBuilder Presentations, Inc. ex rel. Barton*, 378 S.W.3d 519, 523 (Tex. App.—Fort Worth 2012, no pet.) ("By the rule of strict construction, 'it is not meant that the statute shall be

6

stintingly or even narrowly construed, but it means that everything shall be excluded from its operation which does not clearly come within the scope of the language used.'") (quoting Norman J. Singer & J.D. Shambie Singer, 3 *Statutes and Statutory Construction*, § 58:2, at 110 (7th ed. 2008)).

**B.     "[M]ember of the electronic or print media"**

The union asserts that it is a "member of the electronic [ ] media" on the basis of its Internet websites, which the union likens to traditional newspapers because the websites "are managed by persons with journalism backgrounds, are directed to a broader audience than just [the union's] members, publish articles and commentary on general political topics, and receive over 4000 readers a day." Whether an organization's online presence qualifies it as a media defendant under section 51.014(a)(6) is a matter of first impression in this Court.

**1.     Not every person who communicates over the Internet is a "member of the electronic [ ] media" under section 51.014(a)(6)**

Neither section 51.014 nor any other provision of the CPRC defines the term "electronic [ ] media" or delineates who is a "member of the electronic [ ] media." We therefore consider the plain and common meaning of the words used. *See City of Rockwall*, 246 S.W.3d at 625–26.

The words "electronic" and "media" are common words that are used frequently in everyday conversation and writing. A well-known dictionary defines "electronic" to describe "the electronic transmission or storage of information, as

7

by television or computer." OXFORD AMERICAN DICTIONARY 1783 (6th ed. 2007). "Media" refers to "[t]he main means of mass communication . . . , esp. newspapers, radio, and television" and is commonly used in the plural to define "the reporters, journalists, etc., working for organizations engaged in such communication." *Id.* at 1729; *accord* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 770 (11th ed. 2003) (defining "media" as "members of the mass media" and noting that "media" is popularly used "in references to agencies of mass communication"); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 841 (4th ed. 2000) (stating that "media" means "all the means of communication, as newspapers, radio, and TV, that provide the public with news, entertainment, etc., usually along with advertising"). The word media is often used as a "shortened form of communications media," BRYAN A. GARNER, *A Dictionary of Modern Legal Usage* 570 (3d ed. 2011) (emphasis omitted), and as a synonym for the "press." *See, e.g.*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 983 (11th ed. 2003) (defining "press" as "the gathering and publishing or broadcasting of news"; "newspapers, periodicals, and often radio and television broadcasting"; and "news reporters, publishers, and broadcasters"); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 841 (4th ed. 2000) (defining "press" as "the collecting and publishing or broadcasting of news; journalism in general[;] [t]he entirety of media and agencies that collect, publish, transmit, or broadcast the

8

news; [t]he people involved in the media, as news reporters, photographers, publishers, and broadcasters"); BLACK'S LAW DICTIONARY 1304 (9th ed. 2009) (defining press as "the news media; print and broadcast news organizations collectively").

That Internet websites fall within the broadest of these definitions as an electronic "means of mass communication" is clear. Described generally, the Internet is an international network of interconnected computers that enables millions of people to communicate with one another in cyberspace and to access vast amounts of information from around the world. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 850, 117 S. Ct. 2329, 2334 (1997). It is a "platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers." *Id.* at 853, 117 S. Ct. at 2335.[5] "Any person or organization with a computer connected to the Internet can 'publish' information." *Id.* Large companies, small organizations, and individual users alike publish on Internet websites, which are "the equivalent of individualized newsletters about that [company, organization, or] person [and] are available to everyone on the [Internet]." *Id*. at 853 n. 9, 117 S. Ct. at 2335 n.9. The various types of Internet

---

[5] The United States Supreme Court described the Internet as being "comparable, from the readers' viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services." *Reno*, 521 U.S. at 853, 117 S. Ct. at 2335−36. From the speakers' point of view, the Internet "constitutes a vast platform from which to address . . . a worldwide audience of millions of readers, viewers, researchers, and buyers." *Id.*

9

websites include corporate websites, e-commerce websites, forum websites, news websites, political websites, religious websites, school websites, blogs, and social networking sites such as Facebook and Twitter, as well as sites that provide webmail service. *See* Wikipedia, The Free Encyclopedia, *Website*, http://en.wikipedia.org/wiki/Website (last visited September 10, 2013).[6]

We agree with the union that a person (or, in this case, an organization) should not be deprived of the benefit of an interlocutory appeal under section 51.014(a)(6) simply because he communicates online. It is undisputed that newspapers, television networks, radio stations, and the journalists, reporters, publishers, and broadcasters who publish in print or over airwaves are members of the electronic or print media. Such entities and persons frequently have an online presence, and their character does not change simply because their communications are transmitted over the Internet rather than in print or on television or radio.

---

[6] We normally do not cite Wikipedia because of concerns for its reliability as a source of information. *See Bing Shun Li v. Holder*, 400 Fed. Appx. 854, 856 n.4 (5th Cir. 2010) (discussing reasons courts are reluctant to look to Wikipedia as authority). We do so in this limited circumstance because Wikipedia's description of the various types of Internet websites incorporates matters of common knowledge of which we are permitted to, and do, take judicial notice. *See* TEX. R. EVID. 201(f) (providing that "[j]udicial notice may be taken at any stage of the proceeding"); *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Texas*, 878 S.W.2d 598, 600 (Tex. 1994) ("A court of appeals has the power to take judicial notice for the first time on appeal").

But section 51.014(a)(6) cannot be read to permit everyone who communicates on the Internet to appeal the denial of a summary judgment based in whole or in part upon a claim or defense arising under the free speech or free press clauses of the United States and Texas Constitutions or Chapter 73 of the CPRC. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6). Such would be an absurd reading of the statute, would render meaningless the statute's express language limiting the class of persons who may appeal to "*members of the* electronic [ ] media," and would run afoul of the Texas Supreme Court's instruction to strictly construe statutes granting interlocutory appeals. *See id.* (emphasis added); *see also CMH Homes*, 340 S.W.3d at 447 (applying rule of strict construction); *Tex. A & M. Univ. Sys.*, 233 S.W.3d at 842−43 (acknowledging that section 51.014(a)(6) applies only to limited class of persons); Michael Hadley, *The* Gertz *Doctrine and Internet Defamation*, 84 VA. L. REV. 477, 487 (1996) (concluding that "most speakers on the Internet could not properly be described as the 'press.'"). We therefore read the statute to draw a line between the "members of the electronic [ ] media" and others who comment on the news or political or social issues over the Internet, even if that line is difficult to discern.

**2. The right of interlocutory appeal under section 51.014(a)(6) depends on who speaks, not on how they speak**

In asserting a right to interlocutory appeal under section 51.014(a)(6), the union relies heavily on the importance of Internet publications in educating and

11

persuading the public.[7] But the legislature did not premise a section 51.014(a)(6) appeal solely on the importance of the "free and untrammeled expression on matters of public concern or interest," *see Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 421 (Tex. 2000) (quoting *Casso v. Brand,* 776 S.W.2d 551, 557 (Tex.1989)), or the assurance of the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S. Ct. 710, 720 (1964). Rather, the right to interlocutory appeal is tied expressly to the speaker's identity, i.e., his or her status as a "*member of* the electronic [ ] media." TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) (emphasis added).

Although most of this State's section 51.014(a)(6) jurisprudence involves parties we would characterize as traditional media―newspapers, television networks, or radio stations―at least two Texas courts have explored the extent to which Internet authors may be "members of the electronic [ ] media." *See Hotze v. Miller*, 361 S.W.3d 707, 711−12 (Tex. App.―Tyler 2012, pet. denied); *Kaufman*

---

[7]   In *New York Times Co. v. Sullivan*, 376 U.S. 254, 266, 84 S. Ct. 710, 718 (1964)— a seminal case on defamation and the First Amendment—the United States Supreme Court offered a similar justification for extending constitutional protection to paid editorial advertisements in newspapers. The Court reasoned that editorial advertisements provide an "important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities―who wish to exercise their freedom of speech even though they are not members of the press." *Id.* at 266, 84 S. Ct. at 718.

*v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 137−43 (Tex. App.—Fort Worth 2009, pet. denied). We look to those opinions for guidance.

In *Kaufman v. Islamic Society of Arlington*, the Fort Worth Court of Appeals considered whether a defendant sued over the content of his Internet article was a "member of the electronic or print media" within the meaning of section 51.014(a)(6). 291 S.W.3d at 137–43. The plaintiff contended that the defendant "merely post[ed] on the internet" and that the online magazine he wrote for, *Front Page Magazine*, was essentially the defendant's own Internet blog. *Id.* at 138. The evidence, however, indicated that the defendant was a full-time professional journalist, the online magazine had a monthly readership of approximately 500,000 people, and the defendant did not control whether his articles were published or how they were edited before publication. *Id.* The court concluded that the defendant was a media defendant and that his Internet article was entitled to the same First Amendment protection as an equivalent print article. *Id.* at 140−41 (noting case law from the Fifth Circuit and Supreme Court affording protection to internet publications).

In reaching its conclusion, the *Kaufman* court adopted a multi-factor test for determining whether an Internet author or publisher is a member of the electronic media. This test looks to "the character and text of the communication itself, its editorial process, its volume of dissemination, the communicator's extrinsic

13

notoriety unconnected to the communication, the communicator's compensation for or professional relationship to making the communication, and other relevant circumstances as the facts may dictate." *Id.* at 142.

In *Hotze v. Miller*, the Tyler Court of Appeals considered whether a physician sued for the content of editorials he published in traditional newspapers and on Internet websites (including the physician's own website) and statements he made in a radio broadcast was a "media defendant." 361 S.W.3d at 711−12. Although the plaintiff disputed the applicability of section 51.014(a)(6) on the ground that the physician was "self-promoting" and not a reporter who disseminated news to the public, the record showed that the physician had an established presence online and in other print and electronic media. *Id.* at 711. While the physician self-published on two websites, he also published editorials in a weekly newspaper, hosted a radio broadcast, and had thirty years' experience as a political writer and journalist. The court concluded that those facts were "sufficient to show that [the physician] was a media defendant" entitled to an interlocutory appeal under section 51.014(a)(6).[8] *Id.* at 712.

---

[8] The court also determined that an interlocutory appeal was permissible because the physician was a person whose communication appeared in or was published by the electronic or print media. *See Hotze*, 361 S.W.3d at 712. We address whether the union is a person whose communication appeared in or was published by the electronic or print media below.

In addition to the reasoning of our colleagues in Fort Worth and Tyler, we are aided in identifying speakers who are "member[s] of the electronic [ ] media" by the legislature's definition of related terms—"journalist" and "news medium"—in section 22.021 of the CPRC, which governs a journalist's qualified testimonial privilege in civil proceedings. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 22.021(2), (3) (West Supp. 2012). A "journalist" is defined as "a person, . . . who for a substantial portion of the person's livelihood or for substantial financial gain, . . . writes . . . news or information that is disseminated by a news medium. . . ." *Id.* § 22.021(2). For purposes of the qualified privilege, "news medium" means:

> a newspaper, magazine or periodical, book publisher, news agency, wire service, radio or television station or network, cable, satellite, or other transmission system or carrier or channel, or a channel or programming service for a station, network, system, or carrier, or an audio or audiovisual production company or Internet company or provider, or the parent, subsidiary, division, or affiliate of that entity, that disseminates news or information to the public by any means, including:
>
> (A) print;
>
> (B) television;
>
> (C) radio;
>
> (D) photographic;
>
> (E) mechanical;
>
> (F) electronic; and
>
> (G) other means, known or unknown, that are accessible to the public.

15

*Id.* § 22.021(3). In noting these definitions, we bear in mind that the interlocutory-appeal and journalistic-privilege statutes do not serve identical purposes and that the broad definition of "news medium" occurs within the context of a privilege that contains multiple other limitations. But we find both definitions' emphasis on persons who or entities that report or disseminate the news as part of their business helpful in discerning the line we must draw in this case.

The historical context of section 51.014(a)(6) also provides some context for the statute's limitation on the persons who may appeal thereunder. *Cf. Ojo v. Farmers Group, Inc.*, 356 S.W.3d 421, 436 (Tex. 2011) (Jefferson, C.J., concurring) (explaining that courts sometimes look to legislative history, as part of larger societal discourse, "because it is useful to understand what options were available when our representatives in government enacted policy"); ANTONIN SCALIA & BRYAN GARNER, *Reading Law: The Interpretation of Legal Texts*, 388 (West 2012) (explaining that courts sometimes look to legislative history "for the purpose of establishing linguistic usage—showing that a particular word or phrase is capable of bearing a particular meaning"). When section 51.014(a)(6) was enacted, the Legislature could not have contemplated that the individual website hosts would be treated as "member[s] of the electronic [ ] media" entitled to an interlocutory appeal of a summary-judgment denial. Subsection (a)(6) was added to the interlocutory appeal statute by the 73rd Legislature in 1993, a time in which

16

the Internet was only beginning to enjoy widespread public use.[9]  *See* Act of June 18, 1993, 73rd Leg., R.S., ch. 855, § 1, 1993 Tex. Gen. Laws 3365, 3366. Our national search of case law predating section 51.014(a)(6)'s enactment returned only one case discussing the Internet. *See United States v. Morris*, 928 F.2d 504, 506−11 (2d Cir. 1991) (determining defendant's criminal liability for releasing Internet "worm" that caused computers at various educational and military institutions to crash).

Given this historical context, it is not surprising that the proponents of subsection (a)(6) offered the amendment as a means to permit "a newspaper, radio station or television station that was sued for libel to make an immediate appeal of a judge's refusal to grant a summary judgment" and spoke of the entities that would benefit from the section's enactment as traditional "media compan[ies]."[10]

---

[9] *See* Michael Aaron Dennis, *Internet*, ENCYCLOPAEDIA BRITANNICA, http://wwww.britannica.com/EBChecked/topic/291494/Internet (last visited September 10, 2013) (explaining that federal legislation paved way for Internet to transition from special use networks to public use networks in 1993).

[10] The debate surrounding section 51.014(a)(6)'s enactment was undoubtedly influenced by the discussion of the privileges enjoyed by various members of the traditional media sued for defamation in federal and state courts. *See* SCALIA & GARNER*, Reading Law: The Interpretation of Legal Texts*, 73, 78 (observing that "words must be given the meaning they had when the text was adopted" and that "[i]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it"). In *Sullivan*, the Supreme Court announced a constitutional privilege applicable to defamation claims brought by public officials in a claim arising out of a political advertisement in a newspaper. 376 U.S. at 279−80, 84 S. Ct. at 725–26. Three

years later, the Court extended the privilege to claims by public figures in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967), another case involving a newspaper defendant. Neither case used the word media, but in subsequent years, the Court focused on balancing the prevention of "media self-censorship," the need to protect the "news media" from liability, and individuals' legitimate interest in being free from reputational injury caused by defamatory statements. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 342, 94 S. Ct. 2997, 3007, 3008 (1974) (stating that the result in *New York Times* and *Curtis* are not "justified solely by reference to the interest of the press and broadcast media in immunity from liability."); *Id.* at 353 (Blackmun, J., concurring) (describing majority opinion as holding that "a State is free to define for itself the appropriate standard of media liability" in defamation claims by private individuals); *Time, Inc. v. Firestone*, 424 U.S. 448, 465, 96 S. Ct. 958, 970, 47 L. Ed. 2d 154 (1976) (Powell, J., concurring) (describing *Gertz* as shielding "the press and broadcast media from a rule of strict liability that could lead to intolerable self-censorship").

In each instance we have found the Texas Supreme Court to use the phrase "media defendant" before section 51.014(a)(6) was enacted, the Court used it in reference to traditional media. *See, e.g.*, *Cain v. Hearst Corp.*, 878 S.W.2d 577, 583 (Tex. 1994) (citing *Machleder v. Diaz,* 801 F.2d 46, 53 (2d Cir.1986), in newspaper-defendant case for proposition that rule holding "a media defendant liable for broadcasting truthful statements and action because it failed to include additional facts that might have cast the plaintiff in a more favorable or balanced light . . . violates the First Amendment"); *Star-Telegram, Inc. v. Walker*, 834 S.W.2d 54, 56 (Tex. 1992) (holding that gag order prohibiting newspaper from publishing information disclosed in open court constituted "a prior restraint on a media defendant"); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990) (noting that claims by private-figure plaintiff against television company, broadcasting company and broadcaster were against media defendant and therefore had to satisfy "constitutional considerations of free speech and free press"); *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 940 (Tex. 1988) (describing television station and two reporters as media defendants); *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 759 (Tex. 1984) (in case against book publisher presumed damages and punitive damages may be recovered against a media defendant only if actual malice is proved); *see also WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 569 (Tex. 1998) (considering claims by journalist who was "a media plaintiff" against

House Comm. on Judicial Affairs, Bill Analysis, S.B. 76, 73rd Leg., R.S. (1993). However, "when the text of a statute logically authorizes the application of the statute to a new technology or communication medium, [courts] should apply the statute in that way." *See Kaufman*, 291 S.W.3d at 141.

Based on the criteria identified in *Kaufman*, the additional focus on journalism found in *Hotze*, the emphasis in CPRC sections 22.021(2) and (3) on the reporting or dissemination of the news, and the historical context in which section 51.014(a)(6) was adopted, we conclude that a person who communicates online qualifies as a "member of the electronic [ ] media" when the person's primary business is reporting the news and they are, as the statute expressly provides, "acting in such capacity."

### 3. Facts that aid in determining whether an Internet author's primary business is reporting the news

Admittedly, it may be difficult to ascertain a person's or entity's primary business. Traditional media—persons and entities historically deriving their income and revenue from advertising and subscriptions—satisfy this test regardless of whether they publish in print, on airwaves, on the Internet, or in some combination of these mediums. However, additional inquiry may be required in cases like this one involving an entity that is not a newspaper, television network,

---

television station media defendant that broadcast allegedly defamatory news reports).

19

or radio station. To the extent the issue of what constitutes a defendant's primary business is disputed, we consider these facts:[11]

- the goods and services offered by the Internet author and the sources of the Internet author's revenue;

- the Internet author's journalistic background, experience, and independence (inquiring whether the author is a journalist by trade, education, or experience; whether the author is a member of various journalistic organizations; and whether the author is reporting information on which he or she has a business, as opposed to news-reporting, interest);

- the extent to which the Internet author has an established presence or reputation in traditional media;[12]

- the character and content of the Internet author's communications[13] and range of reporting (inquiring about the primary purpose of the internet communication; whether the communication involves matters of public concern; and the breadth of its coverage);

- the editorial process (inquiring whether journalists select the stories to be researched and published on the website, whether the selection of stories was driven by their newsworthiness or other factors; and

---

[11] While we consider many of the same facts as the *Kaufman* court considered, we treat these facts as dispositive of a single issue—the defendant's primary business. Thus, we do not treat them as "factors" or balance them but, instead, consider them in toto in determining the defendant's primary business.

[12] *Kaufman* examined the author's "notoriety outside of the parameters of the article . . . at issue." 291 S.W.3d at 140. This fact involves the same type of inquiry, although we do not term it a "notoriety" inquiry.

[13] *Kaufman* examined the character and content of a single internet article. *See* 291 S.W.3d at 133−34. Because section 51.014(a)(6) permits an interlocutory appeal by a particular party—a member of the media—and is not based solely on the characteristics of the communication itself, we look more broadly at the entirety of the union's communications.

whether journalists supervise the research and act as the primary authors or editors of the website content); and

- the size, nature, and diversity of the readership and whether the readership relies on the author to obtain news.

No one fact is dispositive; rather, the inquiry should focus on the totality of the circumstances. For example, traditional media outlets publish commentary and editorials, some of which are not objective or neutral in their viewpoints, but they are nevertheless members of the media. Another example: a small-town newspaper that no longer prints a newspaper but elects to disseminate the news online is a member of the media. But a person who prints and distributes one million copies of a flyer may not be a member of the media despite his or her breadth of readership.

With these facts in mind, we turn to the issue of whether the union's primary business is reporting.

### 4. The union does not qualify as a "member of the electronic [ ] media"

As we have already noted, the union asserts that it is a member of the electronic media on the basis of its websites; it does not argue that any of its other publications qualify it as a media defendant. The evidence contained in the appellate record and submitted through an additional affidavit filed with this Court[14] establishes the following:

---

[14] Attached to the union's response to PJS's dismissal motion is the affidavit of Inga Skippings, the union's National Communications Director. This affidavit was not

21

- The union has a communications department and a National Communications Director.

- The National Communications Director has a journalism background, having been employed previously by ABCNEWS and with local affiliates of NBC and ABC. Some, but not all, of the union's other communications staff have journalism backgrounds.

- The union's communications department is divided into two sections: (1) "Traditional Media" for the union's communications in print and broadcast media such as newspapers, television, and radio; and (2) "New Media" for the union's websites and other social media.

- The union "publish[es] articles on-line, and seek[s] to have articles published in print or in other traditional media, regarding paying employees a living wage, social and economic justice, and other political issues." The union strives to affect public opinion on the various matters of public concern, and thus the union seeks to reach an audience broader than its membership.

- The union's websites sometimes "contain links to opinion, video presentations, speeches and news stories about [ ] janitors, and which feature[ ] public figures and other speakers."

---

presented to the trial court and is not included in the appellate record. It constitutes newly created evidence for the purpose of establishing this Court's jurisdiction. PJS did not move to strike the affidavit or assert that the case should be remanded to the trial court for resolution of disputed fact issues raised in the affidavit. We may consider documents submitted by the parties that are outside of the trial court's record for the purpose of determining our own civil jurisdiction. *See* TEX. GOV'T CODE ANN. § 22.220(c) (West Supp. 2012) ("Each court of appeals may, on affidavit or otherwise, as the court may determine, ascertain the matters of fact that are necessary to the proper exercise of its jurisdiction."); *Kaufman*, 291 S.W.3d at 139 n.20; *see also Lindsey v. Kline*, No. 2-03-00239-CV, 2004 WL 1699909, at *2 (Tex. App.—Fort Worth July 29, 2004, no pet.) (mem. op.) (stating that appellate court may consider affidavit together with other evidence not included in appellate record to determine jurisdiction).

- All of the union's websites and electronic communications together draw more than 4000 daily readers.

- The editorial or vetting process used to publish press releases on the union's website is similar to the editorial or vetting process used by members of traditional media in that information is collected from sources and is then reviewed for accuracy and truthfulness by researchers and others. The union's publications are also edited or reviewed by lawyers.

- The union's websites do not produce income or have advertising.

PJS argues that, while these facts establish that the union has "a frequented website and a functioning communications department," they do not demonstrate that the union is a member of the electronic media. We agree that the record does not establish that the union qualifies as a member of the media under 51.014(a)(6) because it is not primarily in the business of news reporting.

We begin with a combined analysis of the first and sixth facts we utilize to determine if the union is primarily in the business of news reporting. The goods and services provided by the union include communications on matters of public that reach more than 4000 people daily. But the record does not establish the extent to which the union focuses its business on or dedicates its resources to the dissemination of news as opposed to the organization and representation of workers. The union's National Communications Director stated that the purpose of the communications department was to "develop articles and other materials to truthfully generate the most interest in the media and increase the interest in our

23

message." These details of the union's efforts to attract media attention undermine the union's position that it is itself a member of the media. The description also distinguishes the union as an entity that strives to generate news rather than report the news. While we agree with the union that its status as a member of the media should not be decided solely by the fact that its websites do not generate income, the union's failure to collect subscription, advertising, or similar fees further distinguishes it from the traditional media.

Turning to the second and third facts pertinent to the primary-business inquiry, we note that the union can only communicate through its individual staff. But the record does not identify any individual journalist who had a hand in researching, drafting, or editing the communications made the basis of PJS's lawsuit and only some of the union's communication staff has a background in journalism. Thus, the union has not demonstrated that the publications in question were authored by journalists or whether those authors have an established presence or reputation in other traditional media. Moreover, the only individual authors identified in the record are the union's vice-president, Houston staff director, and two "researchers." And none of these individuals purport to have any journalistic or similar experience.[15]

---

[15]  This makes our case unlike the situation in *Kaufman*, where the court qualified the defendant as a media defendant based on his individual background and notoriety

Considering the whole of the union's communications under the fourth fact in our primary-business inquiry, we conclude that the reporting by the union is not substantially similar to the reporting by traditional media. The union admits that its communications are published for reasons other than the dissemination of news to the public; the union aims to incite action or to sway public opinion through its websites. The affidavits submitted in support of the union's summary-judgment motion universally describe the union's communications as part of a "Justice for Janitors" publicity campaign. The vice-president who had "some supervisory duties" over the campaign described the campaign as "trying to organize and improve the working conditions of janitors, and similar workers, employed in cleaning commercial offices and other buildings." According to the vice-president, "all" of the communications at issue here were "undertaken for the purpose of trying to improve the terms and conditions of these workers' employment" and "occurred in what is known as a 'Labor Dispute,' or as part of a campaign or controversy concerning the terms, tenure or conditions of employment or concerning the association or representations of persons in . . . changing or seeking to arrange terms or conditions of employment of PJS's employees." These are not activities associated with the traditional media.

apart from the article at issue and based on the Internet publication's independent existence as a news medium with a broad readership. 291 S.W.3d at 139–43.

The union's campaign includes flyers and newsletters and protests "to alert employees, customers, tenants and persons that do business with PJS of [the union's] opinions and views on the plight of "PJS's janitors. "As part of that campaign, the union's organizers make contacts" with PJS's employees, frequently by meeting them as they enter or leave work, and urge them to join the union. The union also sends "delegations, which often include the workers themselves, to make presentations to political leaders, community groups, and pension funds that own or invest in a building cleaned by a contractor." The vice-president further explained that when janitors "provide information that indicates that the employer is engaged in unfair or illegal labor or pay practices, [the union organizers] gather that information for use in the campaign." A union "researcher" stated in another affidavit that he uses information gathered from janitors to draft "the PJS organizing campaign" flyers and other communications. The union's other communications included press releases, "reports to the public," handbills, newsletters, letters, and website statements.

Although the limited evidence regarding the fifth fact in our primary-business inquiry establishes some similarities between the union and traditional media in that fact checking and multiple-party review is involved in the union's editorial process, the union's National Communications Director did not establish that anyone with substantial journalistic experience controls or is

substantially involved in the editorial process. Journalism involves much more than research, editing, and vetting. This Court's own opinions go through a similar editorial process and are made publicly available on our website, but this Court is not a member of the electronic media.

For all these reasons, we conclude that, although the record establishes that the union publishes information concerning political and social issues to the public through its websites, the record does not establish that the union's primary business is reporting the news or that it was acting in the capacity of a journalist or news reporter in publish its statements about PJS. Thus, the union does not qualify as a "member of the electronic [ ] media." We therefore turn to the issue of whether the union qualifies as a "person whose communication appeared in or was published by the electronic or print media." TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6).

## C. Person whose communication appeared in or was published by the electronic or print media

A person who is not a member of the electronic or print media may pursue an interlocutory appeal if its communication appeared in or was published by the electronic or print media. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6). PJS argues that the union cannot make such a showing because PJS's lawsuit is not based on any statement made by the union in a newspaper article or on a television or radio broadcast; rather, PJS's defamation claims arise from the union's self-

published statements in letters to third parties, flyers, handbills, newsletters, website postings, press releases, reports, and oral testimony. The union responds that interlocutory jurisdiction exists because at least one press release appearing on the union's website and alleged by PJS to be defamatory—the June 15, 2006 press release entitled "New Lawsuit: Immigrant Janitors Instructed to Work 'Off-the-Clock' by Houston's Largest Local Cleaning Firm"—was "picked up" by the Associated Press and re-published by a number of traditional news media outlets.[16] According to the union, PJS seeks to hold the union liable for the citations to and quotations from the press release in the newspaper articles and television and radio broadcasts covering a lawsuit filed by PJS employees for federal labor-law violations because those articles and broadcasts were attached to an allegedly defamatory "Report on Professional Janitorial Service (PJS)" authored by the union. We disagree.

PJS has not plead any claims based on the publication of the newspaper articles or television and radio broadcasts covering the lawsuit filed by PJS employees. Neither does PJS allege that the articles attached to the report that is the subject of its lawsuit are defamatory. The report contains an executive

---

[16] Specifically, the union asserts that its press release formed the basis of stories published by the *Fort Worth-Star Telegram*, the *Dallas Morning News*, the *Austin American-Statesman*, the *Houston Chronicle* and broadcast by KTRH Radio and several television news stations.

summary and sections addressing PJS's alleged unlawful business practices and the federal lawsuit filed against PJS and accuses PJS of threatening and intimidating workers who show an interest in unionizing. PJS's claim is that the statements in the report authored by the union are defamatory, not its news-article attachments. Moreover, the written publications from the news media outlets that appear in the record do not attribute the information reported to the union or include any official statement from the union. Nor are any union representatives quoted in the articles. The only persons quoted in any of the written publications are PJS employees and the lawyer who filed the federal lawsuit on their behalf. As concluded by our sister court of appeals in Houston, unattributed or nonspecific background information in a media publication is not worthy of the protections afforded by section 51.014(a)(6).[17] *Quebe v. Pope*, 201 S.W.3d 166, 170 n.5 (Tex.

---

[17]     The *Quebe* court based its holding on legislative history, stating:

> As originally proposed, the amendatory legislation, Senate Bill 76, applied only to members of the media. Senate Comm. on State Affairs, Bill Analysis, Tex. S.B. 76, 73rd Leg., R.S. (1993). Senator Jim Turner, the bill's sponsor, offered an amendment that extended application to persons other than members of the media. In a note accompanying the amendment, Turner explained: "For example, it would cover persons who have letters or op-ed pieces published in newspapers or magazines or who express their opinions on radio or television programs." Floor Amendment No. 2 to Tex. S.B. 76, 73rd Leg., R.S. (February 25, 1993). The bill was passed as amended. S.J. of Tex., 73rd Leg., R.S. 312 (1993). Although certainly not conclusive regarding legislative intent, it appears from Turner's comment that he would not view unattributed, nonspecific

App.—Houston [14th Dist.] 2006, pet. denied). Thus, on this record, we cannot hold that the union's communication "appear[ed] in or [was] published by the electronic or print media." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6).

**Conclusion**

Because we have concluded that the union is neither a "member of the electronic or print media" nor a "person whose communication appear[ed] in or [was] published by the electronic or print media," the criteria for the exercise of this Court's appellate jurisdiction under section 51.014(a)(6) are not satisfied. Accordingly, we hold that the union's appeal falls outside the scope of our interlocutory jurisdiction, we grant PJS's motion, and we dismiss the appeal.

Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.

---

background information as worthy of the protections afforded by section 51.014[a](6).

201 S.W.3d at 170 n.5.