# Supreme Court of Texas

════════════

No. 20-0393

════════════

James Fredrick Miles,

*Petitioner*,

v.

Texas Central Railroad & Infrastructure, Inc. and
Integrated Texas Logistics, Inc.,

*Respondents*

════════════════════════

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

════════════════════════

**Argued January 11, 2022**

JUSTICE LEHRMANN delivered the opinion of the Court, in which Chief Justice Hecht, Justice Boyd, Justice Busby, and Justice Young joined.

CHIEF JUSTICE HECHT filed a concurring opinion, in which Justice Young joined.

JUSTICE YOUNG filed a concurring opinion.

JUSTICE DEVINE filed a dissenting opinion.

JUSTICE HUDDLE filed a dissenting opinion, in which Justice Devine and Justice Blacklock joined.

Justice Bland did not participate in the decision.

At the outset, it is important to recognize what this case is about and what it is *not* about. The case involves the interpretation of statutes relating to eminent domain; it does not ask us to opine about whether high-speed rail between Houston and Dallas is a good idea or whether the benefits of the proposed rail service outweigh its detriments. The narrow issue presented is whether the two private entities behind the project have been statutorily granted the power of eminent domain, a power otherwise reserved to the State and its political subdivisions because of the extraordinary intrusion on private-property rights that the exercise of such authority entails.

The owner of real property located along the proposed railway route sued both entities, seeking a declaratory judgment that they lack eminent-domain authority. The entities rely on the Texas Transportation Code's grant of eminent-domain authority to "legal entit[ies] operating a railroad" (railroad companies) and to "corporation[s] chartered under the laws of this state to conduct and operate an electric railway between two municipalities in this state" (interurban electric railway companies) for that authority. TEX. TRANSP. CODE §§ 81.002(2), 112.002(5), 131.011–.012. The trial court held that the entities do not qualify as either railroad companies or interurban electric railway companies and granted summary judgment to the landowner. The court of appeals reversed, holding that the entities qualify as both. We agree with the court of appeals that the entities have eminent-domain power as interurban electric railway companies and need not address whether they also qualify as railroad companies. We therefore affirm the court of appeals' judgment.

# I. Background

Texas Central Railroad & Infrastructure, Inc. (Texas Central Railroad) was formed in December 2012 as TXHS Railroad, Inc. In January 2015, Texas Central Railroad amended its articles of incorporation to change its name and to state that it was organized "to plan, build, maintain and operate an interurban electric railroad." In September 2017, Integrated Texas Logistics, Inc. (Texas Logistics) was formed "[t]o construct, acquire, maintain, or operate lines of electric railway between municipalities in this state for the transportation of freight, passengers, or both" and "[t]o operate and transact business as a railroad company." Texas Central Railroad and Texas Logistics (collectively, the Texas Central Entities) share office space, officers, employees, and contact information. As noted, the entities are jointly endeavoring to build a railway for a high-speed train between Houston and Dallas.

According to the Texas Central Entities' summary-judgment evidence, Texas Central Railroad "is primarily responsible for pre-construction activities related to design and right-of-way acquisition," has "overall construction responsibility," and is "responsible for the construction activities related to the tracks, stations, platforms, power systems, communication systems, and other infrastructures along the route." Texas Logistics, in turn, "will support and assist [Texas Central Railroad] and contractors in the procurement, storage, and timely delivery of the rolling stock [trains] and [construction] component parts," "procure, own, and operate any

[necessary] short line railroads," and ultimately "maintain the rail infrastructure and rolling stock."

In January 2016, Texas Central Railroad began conducting "on-the-ground surveys and examinations" of land in connection with evaluating proposed routes for the project. Two months earlier, in November 2015, Texas Central Railroad had contacted petitioner James Miles about surveying his property. Miles owns approximately 600 acres of property in Leon County along the project's "preferred" route, as determined by the Federal Railroad Administration, and the planned railway will essentially bisect Miles's property with a 100-foot right-of-way. Miles refused to consent to a survey of his property and sued Texas Central Railroad for a declaratory judgment that, among other things, Texas Central Railroad lacked eminent-domain authority. Texas Central Railroad counterclaimed for a declaratory judgment that it is a "railroad company" and an "electric railway" with eminent-domain power under Chapters 112 and 131 of the Transportation Code. Texas Central Railroad also sought to enjoin Miles from interfering with its access to the property for survey purposes. Texas Logistics intervened in the suit and sought similar relief.

The parties filed cross-motions for summary judgment, taking diametrically opposing views on both the proper interpretation of the statutes at issue and the status and wisdom of the project. The Texas Central Entities focused on the following accomplishments as of the date of the summary-judgment hearing in August 2018:

- Texas Central Railroad had spent over $125 million on the project.

4

- Nearly 100 technical experts were engaged on the project, along with 200 employees and contractors.

- Over 2,000 surveys had been completed, and hundreds of option contracts to purchase land needed for the railway had been executed.

- Texas Central Railroad signed an agreement with Amtrak to connect the railway with Amtrak's interstate rail system.

- The Texas Central Entities retained, as a consultant, Central Japan Railway Company, the company that built and successfully operates the high-speed train in Japan.

- Texas Logistics retained Bechtel, an engineering company that has completed more than 300 major train and subway projects, to manage the project.

- The Texas Central Entities had been engaged for several years with various state and federal regulators to obtain the necessary permits and safety rules. Specifically, the Federal Railroad Administration issued a Draft Environmental Impact Statement and was considering Texas Central Railroad's petition for rules to govern the high-speed train's system and operations;[1] Texas Central Railroad was working with the Army Corps of Engineers to secure necessary permits; and Texas Central Railroad had petitioned the Surface Transportation Board to assert jurisdiction over the project.[2]

---

[1] The FRA has since issued a Final Environmental Impact Statement in cooperation with several other federal agencies. It has also granted Texas Central Railroad's petition for rulemaking and published safety standards for the train's operation.

[2] The Board initially declined jurisdiction but granted Texas Central Railroad's petition to reopen and granted jurisdiction over the project after Texas Central Railroad agreed with Amtrak to connect its high-speed rail to Amtrak's lines.

The Texas Central Entities contended that they satisfy the plain language of the statutory provision granting eminent-domain authority to interurban electric railway companies: they are both "corporation[s] chartered under the laws of this state to conduct and operate an electric railway between two municipalities [Houston and Dallas] in this state." TEX. TRANSP. CODE § 131.011. They also contended that they qualify as railroad companies—legal entities "operating a railroad"—because the ordinary meaning of "operating" includes the Texas Central Entities' work of constructing, conducting, and maintaining a railroad between Houston and Dallas. *Id.* § 81.002(2).

By contrast, Miles emphasized that:

- Texas Central Railroad did not own any railroad tracks;

- Texas Central Railroad did not own any rolling stock (trains);

- Texas Central Railroad had not constructed any train stations;

- Texas Central Railroad had secured only a small fraction of the necessary financing for the project; and

- Texas Logistics had no employees, officers, or office space independent of Texas Central Railroad.

Miles contended that Texas Central Railroad (1) could not acquire eminent-domain authority merely by performing the equivalent of "checking a box"; (2) did not qualify as a railroad company because it was not presently "operating a railroad, *i.e.*, a physical train on a set of physical tracks"; and (3) did not qualify as an interurban electric railway company because the interurban electric railways the statute references have been obsolete for over seventy years, the statute was not intended

6

to apply to high-speed rail, and any authority Texas Central Railroad otherwise had as an "interurban" expired.

The trial court granted Miles's summary-judgment motion, declaring that neither Texas Central Railroad nor Texas Logistics qualifies as a railroad company or an interurban electric railway company and dismissing the claims against Miles with prejudice. The trial court also awarded Miles attorney's fees. The Texas Central Entities appealed. The court of appeals reversed, holding that the Texas Central Entities have eminent-domain power as both railroad companies and interurban electric railway companies. 635 S.W.3d 684, 697 (Tex. App.—Corpus Christi–Edinburg 2020). We granted Miles's petition for review and have received a substantial number of amicus briefs and letters in support of both Miles and the Texas Central Entities.

## II. Standard of Review

"On cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law." *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). When the trial court grants one motion and denies the other, as is the case here, we "determine all questions presented" and "render the judgment that the trial court should have rendered." *Id.*

Evaluating the propriety of summary judgment in this case requires us to engage in statutory interpretation, a legal question governed by well-settled principles:

> In interpreting statutes, we must look to the plain language, construing the text in light of the statute as a whole. A statute's plain language is the most reliable guide

to the Legislature's intent. The statutory terms bear their common, ordinary meaning, unless the text provides a different meaning or the common meaning leads to an absurd result. This Court may not impose its own judicial meaning on a statute by adding words not contained in the statute's language. If the statute's plain language is unambiguous, we interpret its plain meaning, presuming that the Legislature intended for each of the statute's words to have a purpose and that the Legislature purposefully omitted words it did not include. The statutory words must be determined considering the context in which they are used, not in isolation.

*Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019) (internal citations omitted).

Because statutes conferring eminent-domain authority intrude on fundamental property rights, "in instances of doubt as to the scope of the power," such statutes are "strictly construed in favor of the landowner." *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline–Tex., LLC*, 363 S.W.3d 192, 198 (Tex. 2012) (*Denbury I*) (citing *Coastal States Gas Producing Co. v. Pate*, 309 S.W.2d 828, 831 (Tex. 1958)). In *Coastal States*, we elaborated on the meaning of strict construction when its use is appropriate, explaining that it "does not require that the words of a statute be given the narrowest meaning of which they are susceptible." 309 S.W.2d at 831. Rather, we accord the language used by the Legislature "a full meaning that will carry out its manifest purpose and intention in enacting the statute" but "confine[] [the operation of the law] to cases which plainly fall within its terms as well as its spirit and purpose." *Id.*

8

## III. Discussion

### A. Constitutional and Statutory Framework

The Texas Constitution circumscribes the exercise of the extraordinary power of eminent domain, providing in pertinent part:

(a) No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person, and only if the taking, damage, or destruction is for:

    (1) the ownership, use, and enjoyment of the property . . . by:

        (A)    the State, a political subdivision of the State, or the public at large; or

        (B)    an entity granted the power of eminent domain under law . . . .

TEX. CONST. art. I, § 17(a)(1). "[T]he power of eminent domain must be conferred by the Legislature, either expressly or by necessary implication, and will not be gathered from doubtful inferences." *Coastal States*, 309 S.W.2d at 831. Even when so granted, the authority remains subject to the constitutional prohibition against the taking of property for private use. *Denbury I*, 363 S.W.3d at 194–95 (explaining that to exercise the Natural Resources Code's grant of eminent-domain authority to "'common carrier' pipeline companies," the company must be building a pipeline to transport gas "'to or for the public for hire,'" not one for only its own use (quoting TEX. NAT. RES. CODE § 111.002(6))).

Two legislative grants of eminent-domain authority are at issue here. First, the Transportation Code authorizes a "railroad company" to, among other things, "exercise the power of eminent domain for the

9

purposes prescribed by this subtitle [C] or Subtitle D" and enter a person's land for the purpose of "mak[ing] an examination and survey for the company's proposed railway . . . as necessary to select the most advantageous route." TEX. TRANSP. CODE §§ 112.002(b)(5), .051(a). A "railroad company" is defined to include:

> (1) a railroad incorporated before September 1, 2007, under former Title 112, Revised Statutes; or
>
> (2) any other legal entity operating a railroad, including an entity organized under the Texas Business Corporation Act or the Texas Corporation Law provisions of the Business Organizations Code.

*Id.* § 81.002. As they incorporated after September 1, 2007, the Texas Central Entities rely on Subsection (2) and contend that each of them qualifies as a "legal entity operating a railroad."

Second, the Transportation Code confers eminent-domain authority—"with all the rights and powers granted by law to a railroad company"—on "[a] corporation chartered for the purpose of constructing, acquiring, maintaining, or operating lines of electric railway between municipalities in this state for the transportation of freight, passengers, or both." *Id.* § 131.012.[3] Chapter 131 designates such a corporation an

---

[3] Section 131.012 provides in full:

A corporation chartered for the purpose of constructing, acquiring, maintaining, or operating lines of electric railway between municipalities in this state for the transportation of freight, passengers, or both freight and passengers may:

> (1) exercise the power of eminent domain with all the rights and powers granted by law to a railroad company; and

10

"interurban electric railway company." *Id.* § 131.011 (defining "interurban electric railway company" as "a corporation chartered under the laws of this state to conduct and operate an electric railway between two municipalities in this state").

The Texas Central Entities thus have eminent-domain authority if they qualify as either railroad companies or interurban electric railway companies.

## B. Interurban Electric Railway Company

### 1. Plain Language

We first address the Texas Central Entities' asserted eminent-domain authority under Transportation Code Chapter 131 as "corporation[s] chartered for the purpose of constructing, acquiring, maintaining, or operating lines of electric railway between municipalities in this state for the transportation of . . . passengers." *Id.* § 131.012. This language could not be more plain insofar as its application to the rail project at issue, which is an "electric railway between municipalities in this state"—Houston and Dallas—"for the transportation of . . . passengers." Indeed, Miles does not contend otherwise.

---

> (2) enter, condemn, and appropriate land, right-of-way, easements, or other property of any person or corporation to acquire:
>
> (A) right-of-way on which to construct and operate lines of railway for the acquiring corporation; or
>
> (B) sites for depots or power plants.

TEX. TRANSP. CODE § 131.012.

Rather, Miles asserts that modern high-speed rail cannot be "shoehorned" into the concept of the interurban electric railway the Legislature envisioned in originally enacting Chapter 131's predecessor in 1907.[4] He asserts that the "concept of an 'interurban electric railway' is a technical term" that describes "a specific kind of train: the single-car interurban electric railways that were an 'outgrowth of the urban trolley' car and that ran throughout Texas in the later nineteenth and early twentieth centuries." The dissent agrees, opining that Chapter 131, read in its historical context, applies only to a kind of train with the ability "to operate in a manner like a single-car trolley lumbering down Main Street." *Post* at 7 (Huddle, J., dissenting).

Viewed as a whole, Chapter 131 is simply not limited in the way that Miles and the dissent contend. First, no provisions in Chapter 131 (or its statutory predecessor) place any limitations on the speed a train may reach in traveling along the anticipated railway, the size of the train, or the distance between the "municipalities in this state" that the railway connects. And in addition to the broad grant of authority in Section 131.012, the statutory scheme contemplates much more than a "lumbering" trolley car. For example, Chapter 131 authorizes "[a] corporation described by Section 131.012" to "lay out right-of-way not to exceed 200 feet in width for its railways," to "construct its railways and appurtenances on that right-of-way," and to "take [with appropriate compensation] for the purpose of cuttings and embankments additional land necessary for the proper construction and security of its railways."

_____

[4] *See* Act effective Mar. 9, 1907, 30th Leg., R.S., ch. 15, 1907 Tex. Gen. Laws 23.

TEX. TRANSP. CODE § 131.013(a). These provisions are wholly compatible with the scale of the project at issue, which will require forty-foot embankments and rights-of-way of up to 100 feet.

Chapter 131 further authorizes a qualifying corporation to "construct its railway along, across, or over any stream, water course, bay, navigable water, arm of the sea, street, highway, steam railway, turnpike, or canal located in the route of its electric railway," *id.* § 131.014(a), and to "erect and operate a bridge, tram, trestle, or causeway" over or across any such waterway or infrastructure, *id.* § 131.014(b). Such a bridge or structure "may not be erected so as to unnecessarily or unreasonably prevent the navigation of the [waterway]." *Id.* § 131.014(c). Chapter 131 thus anticipates that the railway could cross major bodies of water and could require extensive infrastructure to do so.

It is true that some of Chapter 131's provisions also contemplate the possibility that an interurban could operate "on or across a street, alley, square, or property of a municipality." *Id.* § 131.014(d). For example, a railway company is authorized to condemn "easements and right-of-way to operate interurban cars . . . on the track of an electric street railway company . . . on any public street or alley in a municipality," subject to the municipality's consent, in order to "secure an entrance into and an outlet from [the] municipality." *Id.* § 131.015(a)–(b). And when it obtains such easements by condemnation, the company must complete construction of the "road" between municipalities within twelve months from the date of the final judgment awarding the easement. *Id.* § 131.016; *see also id.* §§ 131.101, .103

(requiring "a person or corporation owning or operating a street railway in or on the public streets of a municipality with a population of 40,000 or more" to sell reduced-fare tickets to children and students). While these particular provisions do not apply to the kind of high-speed rail project at issue, which undisputedly will not operate on streets within a municipality, they are not an indication that Chapter 131 as a whole encompasses only those projects involving trains that will do so.[5] We do not read Chapter 131 to implicitly place the above-described limitations on the statute's scope—regarding speed, size, and distance—that the Legislature easily could have placed expressly but chose not to. *See BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 87 (Tex. 2017) ("We must rely on the words of the statute, rather than rewrite those words to achieve an unstated purpose." (citation omitted)).

---

[5] Miles also appears to contend that the fact that the Texas Central Entities' proposed railway will connect to the interstate rail system, and thus be subject to the Surface Transportation Board's jurisdiction, means it cannot be an "interurban" railway. We disagree. The Board "has jurisdiction over transportation by rail carrier," 49 U.S.C. § 10501(a)(1), including "transportation in the United States between a place in . . . a State and a place in the same or another State as part of the interstate rail network," *id.* § 10501(a)(2)(A). "[R]ail carrier" is defined to exclude "interurban electric railways not operated as part of the general system of rail transportation." *Id.* § 10102(5). The only reasonable reading of these provisions is that interurban electric railways that *are* operated as part of the general system of rail transportation are subject to the Board's jurisdiction. They certainly do not indicate that any railway connected to the interstate rail network cannot qualify as an "interurban" railway. *See Spokane & Inland Empire R.R. Co. v. United States*, 241 U.S. 344, 346 (1916) (considering the application of federal railway-safety laws to a company that operated "several interurban electric lines, one of which extended from Spokane[, Washington] to Coeur d'Alene, Idaho").

Of course, when the statutes governing interurban electric railways were originally enacted in 1907, the modern version of high-speed rail had not yet been developed. To support his argument that Chapter 131 thus cannot apply to high-speed rail, Miles relies on the interpretive principle that when a statute contains undefined terms, we consider the terms' ordinary, common meaning when the statute was enacted. *VIA Metro. Transit v. Meck*, 620 S.W.3d 356, 369 (Tex. 2020) (citing *Taylor v. Firemen's & Policemen's Civ. Serv. Comm'n*, 616 S.W.2d 187, 189 (Tex. 1981)). That principle is of limited usefulness here for several reasons. First, we are not attempting to discern the ordinary meaning of an undefined term, as Chapter 131 specifically defines the term "interurban electric railway company" as a "corporation chartered . . . to conduct and operate an electric railway between two municipalities in this state." TEX. TRANSP. CODE § 131.011. Second, even if the term were undefined, Chapter 131 is not written to grant eminent-domain authority to an "interurban electric railway company." Rather, after defining that term in Section 131.011, the statute goes on in Section 131.012 to confer such authority even more broadly on "[a] corporation chartered for the purpose of constructing, acquiring, maintaining, or operating lines of electric railway between municipalities in this state for the transportation of freight, passengers, or both freight and passengers." *Id.* § 131.012. There is no dispute about the ordinary meaning of any of those words, either individually or in context. To construe Chapter 131 as inapplicable to the Texas Central Entities requires placing extratextual, and thus improper, limitations on the statute's reach.

15

Third, we have long interpreted statutes, including eminent-domain statutes, to embrace later-developed technologies when the statutory text allows. Over a century ago, in examining the statutes governing telegraph companies' exercise of the right of eminent domain, we explained that "if the [statutory] language used is broad enough to embrace a subsequently developed method, the later invention might be controlled by the pre-existing law, as if it had been in existence at the time the law was made." *San Antonio & A.P. Ry. Co. v. Sw. Tel. & Tel. Co.*, 55 S.W. 117, 117 (Tex. 1900). We thus held that those statutes applied to telephone companies even though "it cannot be supposed that the legislature had telephones in mind when it used the word 'telegraph.'" *Id.*; *see also Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 140–41 (Tex. App.—Fort Worth 2009, pet. denied) (citing *San Antonio & A.P. Ry. Co.* in holding that the statutory provision authorizing interlocutory appeal of an order denying a motion for summary judgment based on a claim against "a member of the electronic or print media," which was enacted in 1993, applied to a claim against a journalist involving an article published in an online magazine). By the same token, high-speed rail was unimaginable when the Legislature passed the 1907 statute at issue here. But if technology had accelerated such that high-speed rail became available in 1908, no one would have thought that the Legislature would need to pass another statute to accommodate it. We agree with the dissent that courts must give a statutory provision the ordinary meaning that it had at the time it was enacted. *Post* at 6 (Huddle, J., dissenting). The 1907 statute's text may have been capacious, but it was not unclear.

16

Additionally, the dissent misapplies the interpretive principle involving the effect of a statutorily defined term's common usage, arguing that such common usage is "the most significant element of the definition's context." *Id.* at 10 (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 232 (2012)). Ironically, in emphasizing the importance of context, the dissent ignores the context of the principle it espouses. That principle is simply a presumption against "counterintuitive definitions," such that "[t]he normal sense of [the defined term] and its associations bear significantly on the meaning of ambiguous words or phrases in the [statutory] definition." SCALIA & GARNER, *supra*, at 232. Neither Miles nor the dissent contends that any of the words or phrases in the statutory definition of "interurban electric railway company" is ambiguous. Nor is the definition "counterintuitive"—the Legislature did not enact the equivalent of a statute defining the word dog to include all horses. *See id.* at 232 n.29 (citing *Garner's Dictionary of Legal Usage* 258 (3d ed. 2011)). The dissent uses the common meaning of "interurban" not to clarify ambiguous terms in a statutory definition, but to change the meaning of unambiguous terms.

Of course, we may not rewrite statutes to broaden their applicability beyond what the plain language encompasses. The United States Supreme Court recently opined as much in analyzing the Telephone Consumer Protection Act of 1991, which made it unlawful to make certain calls using an "autodialer." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021). The Act defines an autodialer as equipment with the capacity "to store or produce telephone numbers to be called,

17

using a random or sequential number generator" and "to dial such numbers." 47 U.S.C. § 227(a)(1). Rejecting the argument that the Act applies to newer technology with "the 'capacity to dial numbers without human intervention,'" the Court held that Congress "did not define an autodialer as malleably as [the respondent] would have liked" and instead focused specifically on "random or sequential number generator technology." *Duguid*, 141 S. Ct. at 1172–73. That reasoning is instructive here. We could not interpret Chapter 131 of the Transportation Code to apply to a corporation constructing a railway for the operation of a steam-powered locomotive, which would require us to ignore the statute's focus on an "electric railway." But nothing in Chapter 131's language limits its applicability to only the "small, single-train, streetcar-based operations" Miles describes. The Texas Central Entities' proposed railway is an "electric railway between municipalities in this state for the transportation of . . . passengers," as Section 131.012 requires. *Cf. Kyllo v. United States*, 533 U.S. 27, 40 (2001) (construing the Fourth Amendment "in the light of what was deemed an unreasonable search and seizure when it was adopted" and holding that the use of thermal imaging from outside the target residence constituted a "search" that was "presumptively unreasonable without a warrant" (citation omitted)). The Legislature used broad language that, again, contains no limitation on the speed of the trains that would transport passengers along those electric railways.

Moreover, Miles necessarily uses inconsistent interpretive lenses to argue that the Texas Central Entities are neither railroad companies (legal entities "operating a railroad") nor interurban electric railway

18

companies. As to the latter, he relies on the state of affairs when Chapter 131 was enacted in its original form. As to the former, he argues that a railroad company cannot include entities that have not yet laid any track, which wholly ignores the historical context in which railroads were granted eminent-domain authority. While we need not decide whether the Texas Central Entities are railroad companies, the manner in which "historical context" is considered should not be massaged to effectuate a desired outcome. It should be consistently applied across the board.

We also note that, according to Miles, Chapter 131 applies to a kind of train "that has 'been extinct in Texas since 1948.'" The dissent agrees, opining that Chapter 131 extends only to a mode of transportation that was "virtually annihilated" by the mid-1930s. *Post* at 6–7 (Huddle, J., dissenting). But nothing in the statute limits its application in this way. Moreover, under that view, Chapter 131 has remained on the books yet served no purpose for the last seventy-four years. And notably, the statute was recodified in 2009 "as a part of the state's continuing [nonsubstantive] statutory revision program," the purpose of which was "to make the law . . . more accessible and understandable by," among other things, "eliminating repealed, duplicative, expired, and executed provisions." Act of May 11, 2009, 81st Leg., R.S., ch. 85, § 1.01, 2009 Tex. Gen. Laws 153, 153. In light of this recent recodification, the dissent's assertion that we have "resurrect[ed]" the statute rings hollow. *Post* at 2 (Huddle, J., dissenting). Indeed, leaving Chapter 131 on the books as part of this statutory revision

19

program makes little sense if it is as outdated and useless as Miles and the dissent claim.

Next, Miles cites various Transportation Code provisions that specifically apply to high-speed rail but are not contained in Chapter 131. Specifically, Section 111.103 authorizes the Texas Department of Transportation to adopt safety standards for high-speed rail systems, defined as "passenger rail service capable of operating at speeds greater than 185 miles per hour," TEX. TRANSP. CODE § 111.103(a)–(b); Section 112.204 requires a high-speed rail operator to implement security standards, *id.* § 112.204; and Section 199.003 prohibits the Legislature from appropriating money to pay costs associated with "high-speed rail"—defined in that section as "intercity passenger rail service that is reasonably expected to reach speeds of at least 110 miles per hour"—"operated by a private entity," *id.* § 199.003(a)–(b). We fail to see how the existence of statutory provisions applicable to high-speed rail, a term that is defined differently depending on the provision, somehow indicates that it does not fall within the scope of the "electric railway" that is the subject of Section 131.012's grant of eminent-domain authority, particularly when nothing in those provisions is incompatible with Chapter 131.

Finally, Miles asserts that the Legislature's 1989 enactment, and 1995 repeal, of the High-Speed Rail Act demonstrates that Chapter 131 cannot encompass the Texas Central Entities and their proposed railway. We disagree. That Act established a state agency to award a franchise to a private entity to construct, operate, and maintain a high-speed rail facility, and it gave the agency the authority to exercise the

20

power of eminent domain. *See* Act of May 29, 1989, 71st Leg., R.S., ch. 1104, § 1, 1989 Tex. Gen. Laws 4564, 4564–65 (repealed 1995). As the Texas Central Entities argue, the Legislature essentially created a public–private partnership with the Act's enactment and then dissolved that partnership with the Act's repeal. It did not purport to restrict eminent-domain authority granted by other statutes.[6] And it is telling that, in arguing that the Texas Central Entities do not qualify as "railroad companies"—which also have eminent-domain authority under the Transportation Code—Miles does not rely on the High-Speed Rail Act or contend that the grant of eminent-domain authority to a railroad company does not encompass high-speed rail. But we see no principled basis to conclude that a "railroad company" includes a high-speed rail operator while an "interurban electric railway company" does not.[7]

---

[6] Arguing that "[o]ther intervening changes in the law further cut against [our] conclusion," the dissent erroneously relies on a 2009 constitutional amendment requiring "a two-thirds vote of each house of the legislature to grant the power of eminent domain to an entity (public or private)." *Post* at 15 n.18 (Huddle, J., dissenting); TEX. CONST. art. I, § 17(c). The amendment erects barriers against conferring eminent-domain authority going forward, but it places no restrictions on existing authority at the time of its adoption. And the amendment easily could have done so; for example, it could have required the Legislature to ratify existing delegations of authority or added restrictions on the future exercise of that authority. It did not. Far from supporting the dissent's subversion of Chapter 131's plain language, the amendment reflects a conscious choice to leave existing eminent-domain authority intact and unaltered.

[7] By the same token, the dissent's assertion that the High-Speed Rail Act "would have been unnecessary if any private entity could simply charter as an interurban" and invoke eminent-domain authority is simply incorrect.

In sum, we hold that Section 131.012's plain, unambiguous language confers eminent-domain authority on the Texas Central Entities. While we resolve doubts about the scope of eminent-domain power in favor of the landowner, none are presented here.

## 2. *Denbury* and "Reasonable Probability of Completion"

Miles argues that, even if a high-speed rail operator *could* be an interurban electric railway company with eminent-domain authority under Chapter 131, neither of the Texas Central Entities may qualify as such a company merely by filing a charter purporting to be one. *See Denbury I*, 363 S.W.3d at 204 ("A private enterprise cannot acquire unchallengeable condemnation power [as a common carrier] merely by checking boxes on a one-page form and self-declaring its common-carrier status."). Citing *Denbury I* and *Denbury Green Pipeline–Texas, LLC v. Texas Rice Land Partners, Ltd.*, 510 S.W.3d 909 (Tex. 2017) (*Denbury II*), Miles contends that a private entity asserting eminent-domain authority "must demonstrate a 'reasonable probability,' through objective evidence, that . . . it will produce the public good for which such authority is sought." He argues that the Texas Central Entities have failed to satisfy this "reasonable probability" test because they cannot

---

*Post* at 15 (Huddle, J., dissenting). The Act created a public–private partnership for funding the high-speed rail project that was contemplated at that time and eventually abandoned. But as noted, the Act had no effect on other eminent-domain statutes. For example, if Amtrak were seeking to exercise eminent-domain authority as a railroad company to operate high-speed rail, one could not plausibly argue that the enactment and repeal of the High-Speed Rail Act forecloses that authority. In other words, the repeal of the High-Speed Rail Act surely does not prevent "railroad companies" from operating high-speed rail.

raise a fact issue, let alone conclusively establish, that the project "has even a 'reasonable probability' of success." While both the Texas Constitution and our precedent preclude an entity from obtaining condemnation authority by checking a box, they do not support the reasonable-probability-of-completion test Miles proposes, which would constitute an unwarranted sea change in eminent-domain law with far-reaching consequences.

In *Denbury I*, we examined the Natural Resources Code's grant of eminent-domain authority to a common carrier, defined in pertinent part as a person who "owns, operates, or manages . . . pipelines for the transportation of carbon dioxide . . . to or for the public for hire." 363 S.W.3d at 197 (quoting TEX. NAT. RES. CODE § 111.002(6)). We explained that a person's common-carrier status under that provision hinges on the anticipated pipeline's serving the public, a result mandated not only by the statute's language but also by the Texas Constitution's prohibition against the taking of private property for private use. *Id.* at 200. And for a pipeline to "serve the public[,] it cannot be built only for the builder's exclusive use." *Id.* We thus held that "for a person intending to build a $CO_2$ pipeline to qualify as a common carrier under Section 111.002(6), a reasonable probability must exist that the pipeline will at some point after construction serve the public by transporting gas for one or more customers who will either retain ownership of their gas or sell it to parties other than the carrier." *Id.* at 202 (internal footnotes omitted). Relatedly, we held that the pipeline owner's "mere assertions of the possibility of public use" were insufficient to meet that standard, particularly in the face of record evidence suggesting the owner "would

23

transport gas only for its own tertiary recovery operations." *Denbury II*, 510 S.W.3d at 914–15. On remand, the owner adduced the objective evidence required to establish a reasonable probability that the pipeline would, at some point after construction, serve at least one unaffiliated customer. *Id.* at 917.

We agree with Miles that, under *Denbury I*, the Texas Central Entities do not qualify as interurban electric railway companies with associated eminent-domain authority merely by claiming as much in their charters, the equivalent of "checking a box." However, there is no dispute that the Texas Central Entities (1) were actually chartered for the statutorily authorized purpose of "constructing, acquiring, maintaining, or operating lines of electric railway between municipalities in this state for the transportation of freight, passengers, or both freight and passengers," TEX. TRANSP. CODE § 131.012; and (2) are engaged in activities in furtherance of that purpose. Nor is there any question that the proposed railway is for "public use." *See* TEX. CONST. art. X, § 2 ("Railroads heretofore constructed or which may hereafter be constructed in this state are hereby declared public highways, and railroad companies, common carriers."); *see also West v. Whitehead*, 238 S.W. 976, 978 (Tex. App.—San Antonio 1922, writ ref'd) ("If a railroad invoking the power of eminent domain is to be a highway, or a common carrier, and open to the promiscuous and uniform use of the public, such facts conclusively make it a public use . . . .").[8] Miles's

_____

[8] Unlike Miles and his supporting amici, JUSTICE DEVINE's dissent opines that the proposed railway cannot be for public use because one of its

24

argument that the Texas Central Entities must further show a reasonable probability that the railway will be successfully completed finds no support in *Denbury* or the Constitution.

Miles's attempt to contort *Denbury* in this way is rooted in legitimate policy justifications: the "result is vital," he contends, "to protect Texas landowners from ill-equipped entities . . . who seek to seize land for speculative projects only to inevitably abandon it when their funding runs dry or regulatory hurdles cannot be cleared." The extent to which the Texas Central Entities are in fact "equipped" to finance and complete the project is hotly disputed, but regardless of who is correct on that front, Texas law envisions and addresses just that concern and others, providing numerous protections to property owners

purposes is to benefit the economy. *Post* at 4–5 (Devine, J., dissenting); *see* TEX. CONST. art. I, § 17(b) ("In this section, 'public use' does not include the taking of property under Subsection (a) of this section for transfer to a private entity for the primary purpose of economic development or enhancement of tax revenues."). Miles has not challenged the Texas Central Entities' eminent-domain authority for failure to comply with Article I, Section 17's requirement that the taking be for a public use; more specifically, he has not claimed at any stage of this litigation that the proposed taking falls within Article I, Section 17(b)'s express limitation on what qualifies as "public use" notwithstanding the Texas Constitution's designation of existing or future railroads as "public highways" and railroad companies as "common carriers." TEX. CONST. art. X, § 2. Nor have the parties addressed whether this case involves a potential "taking of property . . . for transfer to a private entity." *Id.* art. I, § 17(b). We decline to raise and decide an issue that Miles has not presented or argued. *Powell v. City of Houston*, 628 S.W.3d 838, 843 (Tex. 2021) ("Our adversary system of justice 'depends on the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present.'" (quoting *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782 (Tex. 2020))).

who are the subject of condemnation proceedings.  Among other protections:

- The property may not be taken, damaged, or destroyed for or applied to private use.  TEX. CONST. art. I, § 17(a); *Denbury I*, 363 S.W.3d at 194–95.

- The property may not be taken without "adequate compensation being made."  TEX. CONST. art. I, § 17(a); TEX. PROP. CODE § 21.042(c) ("If a portion of a tract or parcel of real property is condemned, the special commissioners shall determine the damage to the property owner after estimating the extent of the injury and benefit to the property owner, including the effect of the condemnation on the value of the property owner's remaining property.").

- Railroad companies and interurban electric railway companies are responsible for all damages that may be caused by examining and surveying a person's property pursuant to their eminent-domain authority.  TEX. TRANSP. CODE §§ 112.051(b), 131.013(b)(2).

- Judicial review is available to challenge a taking when the condemnor's actions are fraudulent, in bad faith, or arbitrary and capricious.  *City of Austin v. Whittington*, 384 S.W.3d 766, 777 (Tex. 2012).

- A property owner is entitled to recover reasonable and necessary attorney's fees and expenses incurred in a condemnation proceeding dismissed by the condemnor.  TEX. PROP. CODE § 21.019(b).

- If "the public use for which the property was acquired through eminent domain is canceled before the property is used for that public use" or "no actual progress is made toward the public use for which the property was acquired between the date of acquisition and the 10th anniversary of that date," the owner is entitled to repurchase the property "for the price paid to the owner by the entity at the time the entity acquired the property through eminent domain." *Id.* §§ 21.101, .103(b).

26

The constitutional and statutory provisions governing eminent domain, as a whole, reflect a balance between the rights of property owners and the benefits served by projects for which eminent domain is authorized. It is not our place to second-guess the product of that balance. *See McIntyre v. Ramirez*, 109 S.W.3d 741, 748 (Tex. 2003).

Miles asserts that a property owner's right to repurchase the property under Texas Property Code Section 21.103 in the event the project is ultimately canceled or indefinitely stalled "will not compensate the landowner for the damage done to it or the stigma associated with encumbrances like railway easements," nor will it compensate for any "vacant buildings, useless tracks, and 40-foot-high embankments" left behind "if the project is abandoned after some of the rail line is actually built." Perhaps not, and perhaps the policy reasons in favor of amending the statutory framework to provide additional landowner protections outweigh the reasons against it. But that is not for us to decide. "We must respect policy-laden statutes as written and give wide leeway to the innumerable trade-offs reflected therein." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 462 (Tex. 2009); *see also Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015) (noting that courts may not "judicially amend a statute").

The reasonable-probability-of-completion test Miles proposes— or, as he frames it, the requirement that an entity seeking to exercise eminent-domain authority establish a reasonable probability at the outset of a project that it "will produce the public good" for which such

authority is sought[9]—would constitute an unprecedented and improper judicial intrusion into the legislative sphere. Further, Miles has no reasoned response to the Texas Central Entities' argument that such a test would necessarily apply to both private and public entities exercising condemnation authority and would potentially imperil any number of large public infrastructure projects. It is within the Legislature's province to limit condemnation authority in this way, but it simply has not done so.

### 3. Expiration of Authority

Texas Government Code Section 2206.101, applicable to entities that were created and "acquired the power of eminent domain" before December 31, 2012, required such entities to "submit to the comptroller [no later than December 31, 2012,] a letter stating that the entity is authorized by the state to exercise the power of eminent domain and identifying each provision of law that grants . . . that authority." TEX. GOV'T CODE § 2206.101(a)–(b). Failure to "submit[] a letter in accordance with Subsection (b)" resulted in the expiration of the entity's eminent-domain authority on September 1, 2013. *Id.* § 2206.101(c).

Texas Central Railroad, which was formed in December 2012 but amended its charter in 2015 to state the company's purpose of operating an interurban electric railway company, submitted a letter to the comptroller on December 26, 2012, identifying Transportation Code

---

[9] Framing the test yet another way, the State as amicus asserts that the Texas Central Entities lack eminent-domain authority "because they cannot show a likelihood that they will procure financing to complete the project."

provisions that grant eminent-domain authority to railroad companies. The letter did not identify Texas Central Railroad as an interurban electric railway company or reference Chapter 131. Relying on this letter, Miles argues that any eminent-domain authority Texas Central Railroad otherwise had as an interurban electric railway company expired on September 1, 2013. Miles does not contend that Texas Logistics' authority expired, as that entity was not formed until 2017 and thus is not subject to Section 2206.101 of the Government Code.

The court of appeals held that, because Texas Central Railroad did not amend its charter until January 21, 2015, to state its purpose as being to build and operate an interurban electric railroad, it did not acquire eminent-domain authority under Chapter 131 before that date and thus "could not have been expected to file a letter with the comptroller purporting to have eminent domain powers that it had not yet acquired." 635 S.W.3d at 694. We agree. As the court of appeals noted, "Section 131.011 requires a corporation to be chartered for a specific purpose: 'to conduct and operate an electric railway between two municipalities in this state.'" *Id.* at 692 (quoting TEX. TRANSP. CODE § 131.011). That stated purpose is a necessary component of acquiring eminent-domain authority under Chapter 131. Accordingly, Texas Central Railroad's eminent-domain authority under that chapter did not expire in 2013.

### C. Railroad Company

The CHIEF JUSTICE'S concurrence would hold that the Texas Central Entities also obtain eminent-domain authority as "railroad companies." *Post* at 5 (Hecht, C.J., concurring). We do not address that

ground for affirmance of the court of appeals' judgment, not because we disagree with the concurrence, but because we need not reach the issue in light of our holding that the entities have eminent-domain authority as interurban electric railway companies.

## IV. Conclusion

On the narrow issue presented, we hold that the Texas Central Entities have eminent-domain authority under Chapter 131 of the Texas Transportation Code. The court of appeals thus correctly (1) reversed the trial court's judgment, (2) rendered judgment granting the Texas Central Entities' motion for partial summary judgment and denying Miles's summary-judgment motion, and (3) remanded for reconsideration of the issue of attorney's fees and costs. We affirm the court of appeals' judgment.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** June 24, 2022